IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

GASCO ENERGY, INC.

Plaintiff,

vs.

ENVIRONMENTAL PROTECTION AGENCY,

Defendant.

---

**COMPLAINT FOR REVIEW OF
FINAL AGENCY ACTION UNDER
THE ADMINISTRATIVE PROCEDURE ACT**

---

1.      Plaintiff Gasco Energy, Inc. ("Gasco") brings this Complaint against Defendant Environmental Protection Agency ("EPA") under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and the Due Process Clause of the Fifth Amendment to the United States Constitution.  The case concerns EPA's determination that Gasco discharged "fill" into wetlands "adjacent" to "navigable water" of the United States within the meaning of section 404 of the Clean Water Act, 33 U.S.C. § 1344, and regulations of the U.S. Army Corps of Engineers ("Corps"), 33 C.F.R. § 328.3(a)(7).

2.      This Complaint challenges the validity of a Findings of Violation and Administrative Order for Compliance issued September 29, 2011 (the "Compliance Order"), by the EPA under authority granted to it under sections 308 and 309(a) of the Clean Water Act, 33 U.S.C. §§ 1318 and 1319(a).  In *Sackett v. Environmental Protection Agency*, 132 S.Ct. 1367,

1374 (2012), the Supreme Court held that section 309 compliance orders are "final agency action" subject to review under the APA, 5 U.S.C. §§ 701-706.

3.      The Compliance Order is unlawful because the EPA lacks jurisdiction over the subject lands.   In support of its assertion of jurisdiction, the EPA relies on an "Initial Enforcement Investigation Report" that includes a document entitled "Preliminary Jurisdictional Determination Findings for Unauthorized Gasco Energy, Incorporated Lamb Trust Wells, #2008-206" ("Preliminary Jurisdictional Determination").

4.      The Preliminary Jurisdictional Determination on which the EPA bases the Compliance Order is arbitrary and capricious because it fails to comply with the applicable standards for delineating wetlands in the arid West, is not supported by substantial evidence, and is otherwise not in accordance with law.

5.      The EPA and the Corps have identically defined "wetlands" to mean "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in *saturated* soil conditions."   33 C.F.R. § 328.3(b); 40 C.F.R. § 230.3(t) (emphasis added).  According to the Corps, such "soils exhibit characteristic morphologies that result from repeated periods of saturation or inundation for more than a few days.  Saturation or inundation, when combined with microbial activity in the soil, causes the depletion of oxygen. This anaerobiosis promotes certain biogeochemical processes, such as the accumulation of organic matter and the reduction, translocation, or accumulation of iron and other reducible elements."  U.S. Army Corps of Engineers. 2006. *Interim regional supplement to the Corps of Engineers Wetland Delineation Manual: Arid West Region*. ed. J. S. Wakeley, R. W. Lichvar,

and C. V. Noble. ERDC/EL TR-06-16. Vicksburg, MS: U.S. Army Engineer Research and Development Center (the "Arid West Supplement") at GASCO 00373, attached hereto as Ex. 11. The Preliminary Jurisdictional Determination and the Compliance Order are arbitrary and unsupported by substantial evidence because the Corps' own field work failed to reveal any evidence of oxygen depletion in the soil, the accumulation of organic matter, or the accumulation of iron or reducible other elements.  Nor did its evidence otherwise show that the soil in question was typically saturated.

6.      The Compliance Order is also unlawful because, contrary to the requirements of the Due Process Clause, EPA has refused to disclose the entire basis for its decision.  The failure to disclose the basis of the decision deprives Gasco of due process because it denies "a meaningful opportunity to challenge the agency's decision."  *Amoco Prod. Co. v. Fry*, 118 F.3d 812, 819 (D.C. Cir. 1997).

## PARTIES

7.      Gasco is a publicly held corporation organized and existing under the laws of the State of Nevada with its principal place of business in Denver, Colorado.

8.      Defendant Environmental Protection Agency is an agency of the United States of America.

95585591.4

## JURISDICTION AND VENUE

9.      This Court has federal-question jurisdiction under 28 U.S.C. § 1331.  The United States has waived its sovereign immunity under the APA, 5 U.S.C. §§ 701-706.

10.      Venue is proper in this Court under 28 U.S.C. § 1391(e) because the EPA issued the Compliance Order from its Region 8 headquarters, located in Denver, Colorado, and because Gasco's principal place of business is located in Colorado.

## FACTS

*Location and Development of the Natural Gas Well*

11.      Gasco is a natural gas exploration and production company that focuses on developing natural gas resources in the Rocky Mountain region, including Utah's Uinta Basin.

12.      As part of its exploration for and production of natural gas in the Uinta Basin, Gasco acquired the right to drill for natural gas on certain private property owned by the Lamb Trust in Uintah County, Utah, in Township 9S, R19E, sections 14, 22, and 23.

13.      Part of the Lamb Trust private property is in the 100-year floodplain of the Green River.

14.      Attached to the Preliminary Jurisdictional Determination is a separate determination by the Corps that the Green River is a traditional navigable waterway of the United States.  Ex. 2 at GASCO 00240-55.

15.      The Green River cuts across the southeast quarter of section 23, Township 9S, R19E in Uintah County.

16.     In December 2004, Gasco performed work on the access road to a well known by the parties as LT 24-14.  In January 2005, Gasco placed a small amount of fill on a soft spot near the road.

17.     The access road to LT 24-14 is within the 100-year floodplain of the Green River.

18.     On or about December 20, 2007, Gasco commenced work to drill a natural gas well in section 23 of Township 9S, R19E in Uintah County (the "LT 12-23 well").

19.     The LT 12-23 well is within the 100-year floodplain of the Green River.

*Development of the Wetlands Jurisdiction Determinations*

20.      On or about January 28, 2008, while Gasco was drilling the LT 12-23 well and after it performed work on the access road to LT 24-14, Bekee Megown of the United States Fish and Wildlife Service (FWS), Utah Field Office, contacted Susan Nall of the Corps and expressed concerns about the fact that Gasco was drilling in the Green River's 100-year floodplain. Specifically, Megown stated the FWS was concerned about potential impacts to fish and their habitat.  Megown attached to the e-mail an aerial photograph of Gasco's activities in the 100-year floodplain.  Ex. 6 at GASCO 00313-14.

21.     On January 29, 2008, Nall responded to Megown, stating that there were no obvious wetlands shown in the photograph attached to the January 28, 2008, e-mail from Megown.  Nall stated that if there were no wetlands, the Corps had no jurisdiction because "impacts to the upland floodplain are unregulated by us."  Nall stated "This is unfortunate but we need some federal handle to get involved."  Nall closed her response by asking if Megown suspected any impacts to surface water from the Gasco wells in the 100-year floodplain, and

stating that she (Nall) "would be happy to contact Gasco if ANYthing looks grey" [*sic*]. *Id.* at GASCO 00311-12.

22.     On January 29, 2008, Megown answered Nall's reply e-mail, stating that her understanding was that Gasco did not use closed loop drilling, that the lack of closed loop drilling meant there likely was a pit in the 100-year floodplain which caused FWS to be concerned about surface water contamination during high flow periods.  Megown further stated that although she had not been to the site, a photograph taken in the summer of 2006 made it look like the area "coming off the uplands area and into the 100-yr floodplain is wet." *Id.* at GASCO 00311.

23.     Megown was incorrect in her understanding.   The FWS permits authorizing Gasco's activities in the 100-year floodplain explicitly required Gasco to use a closed loop drilling system instead of a pit.  Gasco used a closed loop drilling system.

24.     On February 5, 2008, Nall had a telephone conference with David Smith, an employee of Gasco, to discuss Gasco's drilling in the 100-year floodplain.  Ex. 7 at GASCO 00316.

25.     On February 5, 2008, Nall sent a follow-up e-mail to Smith.  Nall's e-mail stated that even though the wells were located on private surface and accessed private minerals, any impacts to "waters of the United States" required a Corps permit.  Nall further stated that the Corps would consider the impacts on threatened and endangered species and consult with the FWS before it would issue any permits.  Ex. 8 at GASCO 00332-33.

26.     In her February 5, 2008, follow-up e-mail to Smith, Nall stated that an initial review of aerial photographs indicated that waters of the United States may be impacted by

Gasco's activity in the 100-year floodplain.  Nall attached to the February 5, 2008, e-mail to Smith the same aerial photograph that Megown attached to the January 28, 2008, e-mail to Nall. In other words, Nall attached the same photograph which just one week before she had determined showed no obvious signs of the area being a wetland.  *Compare id.*, *with* Ex. 6 at GASCO 00311-12.

27.     In her February 5, 2008, follow-up e-mail to Smith, Nall asked Gasco to state whether it had mapped the "waters of the United States" before beginning construction activities in the 100-year floodplain and, if it had, to provide a copy of the mapping.  If Gasco had not mapped the "waters of the United States," Nall requested that Gasco retain a wetlands consultant to complete the mapping.  Ex. 8 at GASCO 00332-33.

28.     In her February 5, 2008, follow-up e-mail to Smith, Nall asked Gasco to describe its pre-project protocols to ensure compliance with the Clean Water Act.  *Id.*

29.     On February 11, 2008, Smith responded to Nall's February 5, 2008, follow-up e-mail, stating that Gasco had engaged a wetlands consultant, SWCA Environmental Consultants ("SWCA"), to map the "waters of the United States" but that due to the weather and snowpack, mapping probably would not be immediately possible.  Smith also reported that Gasco had been working directly with FWS officials regarding special permits for the wells in the 100-year floodplain, and that neither FWS nor any other party had ever raised any possibility that the areas might be wetlands.  Finally, Smith stated that Gasco was working to gather the additional information requested by Nall, and requested a meeting to discuss the issues.  *Id.* at GASCO 00332.

30.     On February 22, 2008, Nall had a telephone conference with Monica Heimdal of the EPA.  Heimdal asked Nall if there were any jurisdictional determination difficulties under *Rapanos v. United States*, 547 U.S. 715 (2006).  Nall informed Heimdal that the investigation was ongoing.  Heimdal requested that Nall keep her up to date on the wetlands determination because the EPA might be interested in taking the case.  Ex. 7 at GASCO 00318-19.

31.     On or about March 1, 2008, Gasco ceased all drilling and construction activities at the LT 12-23 well and did not complete the well as planned.

32.     Gasco retained SWCA both to complete a wetlands jurisdictional determination and to complete a delineation of the ordinary high water mark of the Green River. *See* Ex. 1-A; Ex. 1-B.

33.     In a report identifying the ordinary high water mark of the Green River, completed in August 2008, SWCA concluded that the LT 12-23 well was above the ordinary high water mark.  Ex. 1-A at GASCO 00022.

34.     In that same report, SWCA concluded that the access road to LT 24-14 was above the ordinary high water mark of the Green River.  *Id.*

35.     In a report delineating "waters of the United States" at the Lamb Trust site, also completed in August 2008, SWCA concluded that the LT 12-23 well was not located in a wetland.  Ex. 1-B at GASCO 00061-62.

36.     In that report, SWCA concluded that the access road to LT 24-14 impacted 0.08 acre of existing wetlands.  Applying the Corps' guidelines, SWCA further determined the Corps would assert jurisdiction over the 0.08 acre of existing wetlands "because of their proximity to, or possible groundwater connection with, the Green River."  Ex. 1-B at GASCO 00061, 00064.

37.     The wetland impacted by the access road to LT 24-14 is approximately 2,270 feet from the ordinary high water mark of the Green River. This wetland is separated from the Green River by land over which the Corps does not assert wetlands jurisdiction.  Ex. 2 at GASCO 00236.

38.     Gasco hired Buys and Associates, Inc. ("Buys") to complete a jurisdictional determination on whether the LT 12-23 well was located in a wetland subject to regulation under the Clean Water Act.  *See* Ex. 1-C.

39.     In a wetland delineation report completed in August 2008, Buys concluded that the LT 12-23 well was not located in a wetland.  *Id.* at GASCO 00137.

40.     Nall, acting for the Corps, completed the Preliminary Jurisdictional Determination on whether the LT 12-23 well was located in a wetland subject to regulation under the Clean Water Act.  *See* Ex. 2.

41.     On or about October 2, 2008, Nall concluded that the LT 12-23 well was located in a wetland adjacent to the Green River and therefore was subject to regulation under section 404 of the Clean Water Act.  *Id.* at GASCO 00235-36.

42.     Nall also concluded that the access road to LT 24-14 impacted 0.08 acre of existing wetlands and that the Corps had jurisdiction over the 0.08 acre of existing wetlands.  *Id.*

*Basis for Jurisdictional Determinations*

43.     The Clean Water Act prohibits discharging dredged or fill material into "navigable waters."  33 U.S.C. §§ 1311(a), 1362(6) and (12).

44.     The Clean Water Act defines "navigable waters" as "waters of the United States, including territorial seas."  33 U.S.C. § 1362(7).

45.     The Clean Water Act does not define "waters of the United States."

46.     The Clean Water Act authorizes the Corps to issue permits allowing the discharge of dredge or fill material into the waters of the United States.  33 U.S.C. § 1344(a).

47.     The Corps defines "waters of the United States" to include, in relevant part, "wetlands adjacent to" waters of the United of the United States.  33 C.F.R. § 328.3(a)(7).

48.     The Corps defines "wetlands" to mean "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions.   Wetlands generally include swamps, marshes, bogs, and similar areas."  33 C.F.R. § 328.3(b).

49.     The Corps defines "adjacent" to mean, in relevant part, "bordering, contiguous, or neighboring."  33 C.F.R. § 328.3(c).

50.     In *United States v. Riverside Bayview Homes, Inc.* the Court held that a wetland that actually abutted a traditional navigable water was part of the waters of the United States. 474 U.S. 121, 135 (1985).

51.     In *Solid Waste Agency of Northern Cook County v. Army Corps of Engineers* the Court held that a wetland that did not actually abut a traditional navigable water lacked a significant nexus with navigable waters and was not part of the waters of the United States.  531 U.S. 159, 167-68 (2001).

52.     In *Rapanos*, a four-member plurality of the Court held that to be an adjacent wetland covered by the Clean Water Act, a wetland must have a continuous surface connection

to waters of the United States such that there was no clear demarcation between the wetland and the waters of the United States.  *Rapanos*, 547 U.S. at 719, 742.

53.     In *Rapanos*, Justice Kennedy's concurring opinion held that to be an adjacent wetland covered by the act, a wetland must have a significant nexus to the waters of the United States.  *Id.* at 767 (Kennedy, J., concurring).

54.     Justice Kennedy held that a significant nexus existed if the Corps could establish that the wetland significantly affects the chemical, physical, and biological integrity of navigable waters.  *Id.* at 779-80.

55.     After *Rapanos*, the Corps and EPA jointly issued guidance stating that they would assert jurisdiction over wetlands that met either the four-member plurality test or Justice Kennedy's significant nexus test.

56.     The Corps' Preliminary Jurisdictional Determination stated that the wetland crossed by the access road to LT 24-14 is adjacent to the Green River.  *Id.* at GASCO 00235.

57.     The Corps' Preliminary Jurisdictional Determination did not conclude that the wetland crossed by the access road to LT 24-14 has a continuous surface connection to the Green River.  *Id.* at GASCO 00235; GASCO 00247-55.

58.     The Corps' Preliminary Jurisdictional Determination did not assert that there is a significant nexus between the wetland crossed by the access road to LT 24-14 and the Green River.  *Id.*

59.     The Corps' Preliminary Jurisdictional Determination asserted that LT 12-23 "contains jurisdictional wetlands directly connecting to the Green River[.]"  *Id.* at GASCO 00235.

60.     The Corps' Preliminary Jurisdictional Determination did not conclude that there is a significant nexus between LT 12-23 and the Green River or that the alleged wetland has a continuous surface connection to the Green River.  *Id.* at GASCO 00235; GASCO 00247-55.

*Guidance On Defining Wetlands*

61.     The Arid West Supplement provides guidance to the Corps' employees on how to determine whether a particular site qualifies as a wetland.  The Arid West Supplement does not bind the public.  *See* Ex. 11 at GASCO 00340.

62.     According to the Arid West Supplement, a wetland determination depends on the presence (or absence) of three indicators:  hydrophytic vegetation, hydric soils, and wetlands hydrology.  *Id.* at GASCO 00349.

63.     All three indicators must be contemporaneously present for a wetland to exist.  *Id.* at GASCO 00349 (listing the required indicators in the conjunctive).

64.     The Arid West Supplement notes that difficult wetland situations exist in the arid west.  The Corps has identified two circumstances that it has determined "difficult."  One is when wetland areas are "problematic" because some naturally occurring wetlands periodically lack one of the three indicators due to normal seasonal variations.  The other is when wetland areas are "atypical" because wetland indicators "are absent due to recent human activities or natural events."  *Id.* at GASCO 00425.

65.     To facilitate a wetland determination in a difficult wetland situation, the Arid West Supplement allows for special considerations when one of the three indicators is problematic, but the other two indicators are present.  *Id.* at GASCO 00426.

*Hydrophytic Vegetation Indicator*

66.     According to the Arid West Supplement, hydrophytic plant determinations are based on the assemblage of plants growing in an area.  *Id.* at GASCO 00360.

67.     Whether plants are hydrophytic (wetlands), as opposed to mesic or xeric (non-wetlands), is determined using the wetlands plant list approved by the Corps.  *See id.* at GASCO 00365; *see also* United States Army Corps of Engineers, *National Wetland Plant List*, http://www.usace.army.mil/Portals/2/docs/civilworks/regulatory/techbio/nwpl_may2012_factshe et.pdf.

68.     The wetlands plant list identifies plants using five categories:

> a.      Obligate Wetland (OBL) which almost always occur in wetlands (estimated probability >99%);
>
> b.      Facultative Wetland (FACW), which usually occur in wetlands (estimated probability 67-99%), but sometimes are found in non-wetlands;
>
> c.      Facultative (FAC), which are equally likely to occur in wetlands or non-wetlands (estimated probability 34-66%);
>
> d.      Facultative Upland (FACU), which usually occur in non-wetlands (estimated probability 67-99%), but sometimes are found in wetlands;
>
> e.      Obligate Upland (UPL), which may occur in wetlands in another region, but occur almost always (estimated probability >99%) under natural conditions in non-wetlands in the region specified.

Plants that never appear in wetlands are not included on the wetlands plant list.  *See id.* at GASCO 00365.

69.     Hydrophytic vegetation generally is present when the assemblage of plants is dominated by a plant species that can tolerate prolonged inundation or soil saturation during the growing season.  According to the Arid West Supplement, hydrophytic vegetation is present when more than 50% of the dominant plant species at a site are OBL, FACW, or FAC.  *Id.* at GASCO 00367-69.

70.     If a finding that hydrophytic vegetation is present cannot be made based on the dominance of hydrophytic vegetation, the Arid West manual allows for a determination based on a prevalence index of 3.0 or less.  *Id.* at GASCO 00369-71.

71.     If vegetation in the area is subject to conditions that are problematic or atypical, the Arid West Supplement allows the use of different criteria, but "only where indicators of hydric soil and wetland hydrology are present but indicators of hydrophytic vegetation are not evident."  *Id.* at GASCO 00434.

<u>SWCA's Hydrophytic Vegetation Determination For LT 12-23</u>

72.     To perform the hydrophytic vegetation determination, in June 2008, SWCA sampled plants in five different locations (SP18-20 and SP23-24) surrounding the LT 12-23 well. Ex. 1-B at GASCO 00061-62; GASCO 00106-11, GASCO 00117-19.

73.     SWCA did not find any OBL plants at any of the locations.  *Id.* at GASCO 0106-11, GASCO 00117-19.

74.     SWCA did not find any dominant FACW plants at any of the locations.  *Id.*

75.     SWCA found dominant FAC plants at each location.  One FAC plant, distichlis spicata (commonly called "saltgrass"), was prevalent and constituted 40% of cover at SP18, 20% at SP19, 30% at SP20, 30% at SP23, and 20% at SP24.  *Id.*

- 14 -

76.     SWCA did not find any dominant FACU plants at any of the locations.  *Id.*

77.     SWCA found dominant UPL plants at SP20, SP23, and SP24.  *Id.* at GASCO 00110-11, GASCO 00117-19.

78.     SWCA noted that distichlis spicata, a "halophyte" (salt-favoring plant) and the dominant FAC plant species at all five locations, is equally likely to be present at the site because of saline conditions as because of water-saturated conditions.   SWCA determined that at the Lamb Trust site the distichlis spicata functioned as a halophyte rather than a hydrophyte (wetland) plant  for the following reasons:

    a.     Distichlis spicata is classified as FAC and can be found in either wetlands or non-wetlands;

    b.     The plant frequently occurs in non-wetland sites with high saline soils;

    c.     There were intact concentrations of salt in the soil at the test sites;

    d.     The plant grew throughout the Lamb Trust property, including areas that did not exhibit any possible indications of wetlands;

    e.     In some of the test sites, UPL plant species grew along with the distichlis spicata; and

    f.     There were no OBL plant species at any of the test sites.  *Id.* at GASCO 00062.

79.     SWCA determined that the hydrophytic vegetation indicator was not met based on either the dominance test or the prevalence test for SP18, SP20 and SP24.  *Id.* at GASCO 00106; GASCO 00110; GASCO 00118.

80.     SWCA determined that if distichlis spicata served a hydrophytic function, the hydrophytic vegetation indicator was met based on the dominance test for SP19 and SP23.  *Id.* at GASCO 00108; GASCO 00116.

81.     If distichlis spicata served a halophytic function, then the dominance test would not be met for either location.  *Id.* at GASCO 00062.

<u>Buys Hydrophytic Vegetation Determination for LT 12-23</u>

82.     To perform the hydrophytic vegetation determination, Buys sampled plants in four different locations (Pits 1 through 4) surrounding the LT 12-23 well in August 2008.  Ex. 1-C at GASCO 00150-57.

83.     Buys found salix exigua, an OBL plant, was dominant and constituted 1% of the cover at Pits 2 and 3.  *Id.* at GASCO 00152-55

84.     Buys found dominant FACW plants constituted 6% of the cover at Pit 1, 2% at Pit 2, 3% at Pit 3, and 6% at Pit 4.  *Id.* at GASCO 00150-57.

85.     Buys found dominant FAC plants constituted 15% of the cover at Pit 1, 20% at Pit 2, 17% at Pit 3, and 14% at Pit 4.  *Id.*

86.     Distichlis spicata was the prevalent dominant FAC plant at each location.  *Id.*

87.     Buys found dominant FACU plants constituted 1% of the cover at Pit 1, 3% at Pit 2, 2% at Pit 3, and 1% at Pit 4.  *Id.*

88.     Buys did not find dominant UPL plants at any of the locations.  *Id.*

89.     Buys determined that the hydrophytic vegetation indicator was met for LT 12-23. Ex. 1-C at GASCO 00136.

95585591.4

<u>The Corps' Hydrophytic Vegetation Determination for LT 12-23</u>

90.    To perform the hydrophytic vegetation determination, Nall sampled plants from four different locations (P1 through P4) surrounding the LT 12-23 well in June 2008.  Ex. 2 at GASCO 00257-64.

91.    Nall found the vegetation at each location was significantly disturbed and naturally problematic.  Nall found the site problematic "due to arid climate."  *Id.* at GASCO 00257, GASCO 00259, GASCO 00261, GASCO 00263.

92.    Nall did not find any dominant OBL plants at any of the locations.  *Id.*

93.    Nall found dominant FACW plants constituted 20% of the cover at P1, 51% at P2, 2% at P3, and 2% at P4.  *Id.*

94.    Nall found that distichlis spicata was the only dominant FAC plant at each location and constituted 50% of the cover at P1, 40% at P2, 50% at P3, and 60% at P4.  *Id.*

95.    Nall found dominant FACU plants constituted 20% of the cover at P1 and P3.  *Id.* at GASCO 00257, GASCO 00261.

96.    Nall did not find any dominant UPL plants at any of the locations.  *Id.* at GASCO 00257, GASCO 00259, GASCO 00261, GASCO 00263.

97.    Nall concluded that the hydrophytic vegetation indicator was met at each location based on the dominance test.  *Id.* at GASCO 00257, GASCO 00259, GASCO 00261, GASCO 00263.

98.    Nall did not complete the prevalence test for any location.  *Id.* at GASCO 00257, GASCO 00259, GASCO 00261, GASCO 00263.

95585591.4

99.    Nall found salt deposits in the soil at the P1, P2, and P4 locations.  *Id.* at GASCO 00258, GASCO 00260, GASCO 00264.

100.    Nall's Preliminary Jurisdictional Determination disagreed with SWCA's conclusion that distichlis spicata functioned as a halophyte, indicating the soil was saline rather than saturated at LT 12-23.  *Id.* at GASCO 00236.

101.    Nall's Preliminary Jurisdictional Determination did not respond to SWCA's specific reasons for concluding that distichlis spicata functioned as a halophyte.  *Id.*

102.    Nall concluded that the hydrophytic vegetation indicator was met for LT 12-23. *Id.*

### *Hydric Soils Indicator*

103.    According to the Arid West Supplement, hydric soils are soil types formed under conditions of saturation, flooding, or ponding long enough during the growing season to develop anaerobic conditions in the upper part of the soils.  Ex. 11 at GASCO 00373.

104.    There exist soil surveys and hydric soils lists for areas within the arid West.  The surveys and lists are not conclusive on the question of whether a given area has hydric soil.  Such information "is not site-specific and does not preclude the need for an onsite investigation."  *Id.* at GASCO 00399.

105.    Hydric soils are identified using a list of common indicators applicable to all soils, or a list of special indicators for problematic soils.  *See id.* at GASCO 00380-98 (listing the various indicators for different soils).

106.    The Arid West Supplement notes that moderately to strong alkaline soils and seasonally ponded soils are often classified as problematic soils.  *Id.* at GASCO 00435-36.

95585591.4

107.    The Arid West Supplement states that  in "problem wetland situations in the Arid West " there are four additional indicators "not currently recognized for general application" and are "not recognized in the specified geographic area." *Id.* at GASCO 00396.  These indicators may be considered if generally recognized indicators are present for wetland hydrology and for hydrophytic vegetation, meaning that the investigator had indicators for vegetation and hydrology without having to treat either as "problematic." *Id.*  Where those conditions are met, an investigator may determine whether the presence of red parent material is "masking" the presence of redoximorphic (or "redox") features.  *Id.* at GASCO 00396, GASCO 00398.  To use these problematic soil indicators, the investigator must "follow the procedure described in the section on Problematic Hydric Soils in Chapter 5" of the Arid West Supplement.  *Id.* at GASCO 00396.  In relevant part, that procedure requires the investigator to determine that "red parent material" is present or to use "alpha, alpha-dipryridyl" dye to test the soil for "reduced iron." *Id.* at GASCO 00438-40.   If the dye produces a positive test indicating the presence of ferrous iron, then the soil likely is hydric.  *Id.* at GASCO 00440.

<u>SWCA's Hydric Soils Determination for LT 12-23</u>

108.    SWCA noted that the soil at the LT 12-23, along with the entire northern floodplain of the Green River, including the obvious uplands, is mapped by the National Resources Conservation Service ("NRCS") as Umbo silty clay loam with inclusions of Wyasket silty clay loam. Ex. 1-B at GASCO 00122-24.

109.    To perform the hydric soils determination, in June 2008, SWCA sampled soil from four different locations (SP18, SP20 and SP23-24) surrounding the LT 12-23 well.  *Id.* at GASCO 00106-07, GASCO 00110-11, GASCO 00116-19.

95585591.4

110.   SWCA did not find any common hydric soil indicators at any of the locations. SWCA did not find any red parent material.  *Id.* at GASCO 00107, GASCO  00111, GASCO 00117, GASCO 00119.

111.   SWCA found intact salt concentrations in the soil at each location.  *Id.*

112.   SWCA concluded that the presence of intact salt concentrations in the soil columns suggested lack of saturation by groundwater or surface water, despite the recent inundation by the Green River's floodwater.  *Id.* at GASCO 00062.

113.   SWCA determined that the hydric soils indicator was not met at the LT 12-23.  *Id.*

<u>Buys Hydric Soils Determination</u>

114.   Buys noted that the soil at the LT 12-23 well is mapped by the National NRCS as Umbo silty clay loam with inclusions of Wyasket silty clay loam.  Ex. 1-C at GASCO 00136.

115.   To perform the hydrophytic vegetation determination, Buys sampled soils from four different locations (Pits 1-4) surrounding the LT 12-23 well in August, 2008.  *Id.* at GASCO 00136; GASCO 00150-57.

116.   Buys found no evidence of any common or problematic hydric soil indicators at any of the locations.  *Id.* at GASCO 00151, GASCO 00153, GASCO 00155, GASCO 00157.

117.   Buys determined that the hydric soils indicator was not met at the LT 12-23 well. *Id.* at GASCO 00137.

<u>The Corps' Hydric Soils Determination</u>

118.   Nall noted that the soil at the LT 12-23 well, along with the entire northern floodplain of the Green River, including the obvious uplands, is listed by the NRCS as Umbo silty clay loam with inclusions of Wyasket silty clay loam.  Ex. 2 at GASCO 00236.

119.   To perform the hydric soils determination, Nall sampled soils from four different points (P1-P4) surrounding the LT 12-23 well in June 2008.  *Id.* at GASCO 00257-64.

120.   Nall found the soil at each location was significantly disturbed and naturally problematic.  Nall found the sites problematic "due to arid climate."  *Id.*

121.   Nall found no evidence of common hydric soil indicators at any of the locations. *Id.* at GASCO 00258, GASCO 00260, GASCO 00262, GASCO 00264.

122.   Nall noted "possible red parent material," a potential indicator for problematic hydric soils, at each of the locations.  *Id.*

123.   Nall conducted one test, at two locations, to determine whether the soil at the LT 12-23 was sufficiently depleted in oxygen to be considered hydric.  *Id.* at GASCO 00258, GASCO 00260.  That test involves applying a solution called alpha-alpha-Dipyridyl to moist soil.  The solution tests for the presence of ferrous iron in the soil.  Hydric soils are anaerobic (oxygen-depleted) soils.  Iron accumulates in anaerobic soils.  If ferrous iron is present, the drops of the solution will turn bright pink within a few seconds.     Natural Resources Conservation Service, Hydric Soils Technical Note 8, attached hereto as Ex. 12.  If the solution turns pink, the results are considered "positive."

124.   Nall performed the alpha alpha-Dipyridyl test at P1 and P2.  Ex. 2 at GASCO 00258, GASCO 00260.  The test results were negative. *Id.*  Nall did not note that, under the Arid West Supplement, typically saturated soil conditions would create a positive result in the alpha alpha-Dipyridyl test.

125.   Nall did not otherwise test the soil for oxygen depletion.  *Id.* at GASCO 00258, GASCO 00260, GASCO 00262, GASCO 00264.

126.   Nall did not report the presence of accumulated organic matter in the soil.   *Id.* at GASCO 00258, GASCO 00260, GASCO 00262, GASCO 00264.

127.   Nall found salt deposits in the soil at P1, P2, and P4.   *Id.* at GASCO 00258, GASCO 00260, GASCO 00264.   Ordinarily, salt would not be found as crystalline deposits in soil if the soil were typically saturated.   The salt would dissolve in the presence of the groundwater.

128.   The Preliminary Jurisdictional Determination acknowledged that "Salt crystals are not a hydric indicator; however, their presence does not preclude or prohibit a soil from being hydric."   The Preliminary Jurisdictional Determination did not explain, however, what other conditions existed in the soil that would be consistent with a hydric soil having salt crystals within it.   *Id.* at GASCO 00263.

129.   The Preliminary Jurisdictional Determination considered one such condition that might support a finding of hydric soils, the presence of "redoximorphic features."   The features are formed in saturated soils by the "reduction" (the "red" of redoximorphic) of iron and manganese or the oxidation (the "oxi" of redoximorphic) of those elements.   Redoximorphic processes begin when the bacteria that decompose organic matter in the soil consume the oxygen in the soil's water.   As the bacteria continue to decompose the soil after the oxygen is depleted, they produce chemicals that reduce the iron and manganese in the soil.   The resulting "redox" features are an indirect indicator of anaerobic soils present in wetlands.   *Id.*

130.   But the Preliminary Jurisdictional Determination noted "the *lack* of redoximorphic features in the soil at this site."   (Emphasis added.)   *Id.*

131.    Relying on information received from Kent Sutcliffe, a soil scientist at the United States Department of Agriculture, the Preliminary Jurisdictional Determination asserted that SWCA's conclusion that the intact salt deposits indicated that wetlands hydrology was not present was incorrect.   The Preliminary Jurisdictional Determination also asserted that "there are several soil conditions that could explain the lack of redoximorphic features. . . .   These include high pH alkaline soil systems, highly oxygenated flood waters, low organic river sediment delivery, and young soil surfaces due to floodplain activity." *Id.*

132.    The Preliminary Jurisdictional Determination includes no evidence that the pH level of the soil was tested.   It includes no evidence supporting the possibility that the other mentioned soil conditions were present at the Lamb Trust site.   It includes no discussion of whether these conditions are considered probative of hydric soils or wetlands hydrology under the Arid West Supplement.  *Compare id.*, *with* Ex. 11 at GASCO 00438-40.

133.    When requesting Sutcliffe's assistance, Nall mentioned visible salt or alkali deposits, but did not state the deposits were intact and present throughout the soil samples.  Ex. 2 at GASCO 00279-80.

134.    Nall's e-mail to Sutcliffe requesting assistance does not describe or attach SWCA's analysis. *Id.*

135.    Sutcliffe's analysis and explanation, contained in a reply e-mail sent to Nall, is completely redacted.  *Id.* at GASCO 00279.

136.    Nall concluded that the soils at the LT 12-23 well are problematic hydric soils as defined by the Arid West Supplement.  Ex. 2 at GASCO 00236.

*Wetlands Hydrology Indicator*

137.     The Arid West Supplement states that the presence of hydrophytic vegetation and hydric soils provide the strongest evidence of wetlands hydrology.  Ex. 11 at GASCO 00400.

138.     The Arid West Supplement states that the purpose of the wetlands hydrology indicator is to provide evidence that a site has continuing wetland hydrologic regime and that the hydric soils and hydrophytic vegetation are not relics of past wetlands status.  *Id.*

139.     The Arid West Supplement states that wetlands hydrology indicators confirm that an episode of soil saturation or inundation occurred recently, but provide little information about the timing, duration, or frequency of the saturation or inundation event.  *Id.*

140.     The Arid West Supplement states that for highly disturbed or problematic sites, "long-term" direct hydrologic monitoring may be needed to determine if wetland hydrology is present.  *Id.* at GASCO 00434.   Direct hydrologic monitoring requires "installation of water-table monitoring wells, and . . . the collection and interpretation of groundwater monitor data[.]"  *Id.*  The Corps did not conduct direct hydrologic monitoring on the Lamb Trust site.

141.     The Arid West Supplement states that the technical standard for direct monitoring of wetlands hydrology requires either fourteen (14) or more days of consecutive days of flooding or ponding or a water table 12 inches or less below the soil surface during the growing season.  *Id.* at GASCO 00446.

142.     The Arid West Supplement states that either the fourteen (14) consecutive days flooding or the 12-inch water table requirement must occur at a minimum frequency of 5 years in 10 (50 percent or higher probability) unless a different standard has been established for a particular geographic region or wetlands type.  *Id.*   The Corps has not established a different

standard for the particular geographic region or wetlands types relevant to the Lamb Trust property.

SWCA's Wetland Hydrology Determination

143.     SWCA determined that the LT 12-23 well was located above the ordinary high water mark for the Green River.  Ex. 1-A at GASCO 00022.

144.     To perform the wetlands hydrology determination, in June 2008, SWCA surveyed five different locations (SP18-20 and SP23-24) surrounding the LT 12-23 well.  Ex. 1-B at GASCO 00106-11, GASCO 00116-19.

145.     SWCA found no evidence of any primary wetlands hydrology indicators at SP18 and SP20.  *Id.* at GASCO 00107, GASCO 00111.

146.     SWCA found evidence of one primary wetlands hydrology indicator at both SP19 and SP23, and two primary wetlands hydrology indicators at SP24.  *Id.* at GASCO 00109, GASCO 00117, GASCO 00119.

147.     SWCA found evidence of secondary wetlands hydrology indicators at each location.  *Id.* at GASCO 00107, GASCO 00109, GASCO 00111, GASCO 00117, GASCO 00119.

148.     SWCA concluded that the wetlands hydrology indicators at SP18, SP19 and SP20 were due to the Green River's recent flood of approximately 23,000 cfs.  *Id.* at GASCO 00061.

149.     SWCA calculated the recurrence interval of a 23,000 cfs flood on the Green River using historical data from the Jensen gauge, which is located upstream from LT 12-23 and maintained by the United States Geological Survey (USGS).  Ex. 1-A at GASCO 00020.

150.   Using Jensen gauge data from 1965-2008, SWCA calculated the following recurrence intervals:

a.      1.5-year recurrence flood occurred in the range of 15,000 to 16,000 cfs;

b.      a 2-year recurrence flood at approximately 17,100 cfs;

c.      a 5-year recurrence flood at approximately 22,900 cfs; and

d.      a 10-year recurrence flood year at approximately 26,300 cfs. *Id.*

151.   SWCA concluded that a 23,000 cfs flood was unrepresentative of typical conditions. Ex. 1-B at GASCO 00061.

152.   According to data from the Jensen gauge, the Green River was flowing at the following rates on May 21-23:

a.      May 21 = 17,000 cfs;

b.      May 22 = 18,900 cfs; and

c.      May 23 = 21,100 cfs.

153.   Inundation at SP23 and SP24 was first observed on May 23, 2008. *Id.* at GASCO 00062.

154.   Assuming a one-day lag time between discharge at the Jensen gauge and when the water reached the LT 12-23 well site, SWCA concluded that the LT 12-23 site would be inundated when flows at the Jensen gauge were between 18,000-20,000 cfs. *Id.* at GASCO 00061-62.

155.   Based on the flow data from the Jensen gauge and the observations of inundation at the LT 12-23 well site, SWCA concluded that the LT 12-23 site would not be inundated when the flows at the Jensen gauge were 17,000 cfs or less. *Id.* at GASCO 00062.

156.     Based on the historic data from the Jensen gauge and the observations of inundation at the LT 12-23 well site, SWCA concluded that the LT 12-23 had less than a 50% probability of being inundated during a given year. *Id.*

157.     SWCA's analysis of the probabilities of inundation were based on flow data for the Green River going back to 1965.  Ex. 1-A at GASCO 00043.

### Buys and Associates Wetland Hydrology Determination

158.     To perform the wetlands hydrology determination, Buys sampled four different locations (Pit 1-4) surrounding the LT 12-23 well in August, 2008.  Ex. 1-C at GASCO 00136; GASCO 00150-57.

159.     Buys did not find any evidence of primary or secondary wetlands hydrology at any of the locations.  *Id.* at GASCO 00151, GASCO 00153, GASCO 00155, GASCO 00157.

160.     Buys determined that the wetland hydrology indicator was not met at the LT 12-23 well.  Ex. 1-C at GASCO 00136-37.

### The Corps' Wetlands Hydrology Determination

161.     The Preliminary Jurisdictional Determination did not dispute SWCA's determination that the LT 12-23 well is above the ordinary high water mark of the Green River.  Ex. 2 at GASCO 00235.

162.     The Preliminary Jurisdictional Determination found  that the Corps and EPA have jurisdiction over the LT 12-23 well location based solely on the conclusion that the LT 12-23 well location is in a wetlands adjacent to the Green River, a traditional navigable waterway.  *Id.*

163.    To perform the wetlands hydrology determination, Nall observed conditions at four different locations (P1-P4) surrounding the LT 12-23 well in June 2008.  *Id.* at GASCO 00257-64.

164.    At each of the locations, Nall found three primary wetlands hydrology indicators:

    a.    observation of surface water as evidenced by Bureau of Land Management (BLM) photographs dated 5/23/08, 6/2/08 and 6/9/08;

    b.    surface soil cracks; and

    c.    inundation visible on an aerial photograph dated 6/5/08 and provided by the Bureau of Reclamation (BOR).  *Id.* at GASCO 00258, GASCO 00260, GASCO 00262, GASCO 00264.

165.    Nall found secondary hydrology indicators at each of the locations.  *Id.*

166.    Nall did not observe any surface water, water table, or saturation at any of the locations during her June 20, 2008, site inspection.  *Id.*

167.    Nall found that each location was inundated for approximately 23 days due to normal seasonal high water table and flooding of Green River.  *Id.* at GASCO 00235.

168.    Nall did not find any of the locations were inundated during May and June 2008 for fourteen days *consecutively*.  *Id.*; *see also* GASCO 00258, GASCO 00260, GASCO 00262, GASCO 00264.

169.    At a meeting with Nall on July 15, 2008, Gasco provided Nall with a log of inundation showing the days on which flood waters inundated LT 12-23 between May 14, 2008, and June 17, 2008.

95585591.4

170.   The log of inundation was based on actual site observations by a Gasco employee. *See* Ex. 1-G.

171.   By letter dated September 12, 2008, Gasco again provided Nall with the log of inundation along with a signed declaration by the Gasco employee who prepared it.  Ex. 1; Ex. 1-G.

172.   According to the log of inundation, the LT 12-23 site was first inundated on May 23, 2008, and remained inundated for five days, until May 27, 2008.  Ex. 1-D.

173.   According to the log of inundation, the LT 12-23 site was not inundated from May 28, 2008, through May 31, 2008.  *Id.*

174.   According to the log of inundation, the LT 12-23 site was inundated from June 1, 2008, through June 11, 2008.  *Id.*

175.   According to the log of inundation, the LT 12-23 site was not inundated from June 12, 2008, through June 17, 2008.  *Id.*

176.   The log of inundation is consistent with Nall's finding that the LT 12-23 site was inundated on May 23, June 2, June 5, and June 9, 2008.  *Compare id.*, *with* Ex. 2 at GASCO 00258, GASCO 00260, GASCO 00262, GASCO 00264.

177.   The log of inundation contradicts Nall's assertion that the LT 12-23 site was inundated for approximately 23 days during May and June 2008.  *Compare* Ex. 1-D, *with* Ex. 2 at GASCO 00235.

178.   The log of inundation shows that the LT 12-23 site was not inundated for 14 consecutive days in May and June of 2008.  Ex. 1-D.

95585591.4

179.    The log of inundation also included a chart showing the discharge at the Jensen gauge on each day within the time period.  *Id.*

180.    According to the chart created from the Jensen gauge data, the Spring 2008 flood peaked the first time on May 24, 2008, at approximately 23,000 cfs.  *Id.*

181.    According to the chart created from the Jensen gauge data, the Spring 2008 flood declined to approximately 16,000 cfs on May 26-29.  *Id.*

182.    According to the chart created from the Jensen gauge data, the Spring 2008 flood peaked a second time at approximately 23,000 cfs on June 5, 2008, and thereafter declined.  *Id.*

183.    The Preliminary Jurisdictional Determination disagreed with SWCA's conclusion that the spring 2008 flood was not representative of typical conditions for the Green River.  It stated instead that "While the Green River has experienced drought conditions over the last eight years, this years' [*sic*] spring runoff equates to a 3 year RI [recurrence interval] based on post-Flaming Gorge USGS ga[u]ge data and is within the range of ordinary."   Ex. 2 at GASCO 00235.

184.    The Preliminary Jurisdictional Determination stated that it based its conclusion that the 2008 spring flood was representative of ordinary seasonal flows on historic flow data, the BOR's 2006 Record of Decision ("ROD") regarding its release goals for the Flaming Gorge dam, and use of an ordinary flood recurrence interval of two to five years.  *Id.*

185.    The Preliminary Jurisdictional Determination contains no information regarding the historical flow of the Green River.  *See generally* Ex. 2.

186.     The Preliminary Jurisdictional Determination did not explain any purported errors in SWCA's analysis of the historical flow data available from the Jensen gauge maintained by the USGS. *See generally id.*

187.     The Preliminary Jurisdictional Determination stated that the BOR's 2006 ROD set a goal of releasing 18,600 cfs for 14 consecutive days from the Flaming Gorge dam, but did not attach a copy of the ROD.  *Id.* at GASCO 00235.

188.     The 2006 ROD adopted the "Action Alternative" stated in the BOR's September 2005 Final Environmental Impact Statement on the Operation of the Flaming Gorge Dam ("FEIS").  Ex. 13 at GASCO 00465.

189.     The Action Alternative in the FEIS recommended that releases from the Flaming Gorge dam allow a maximum spring flow of 18,600 cfs at the Jensen gauge in at least one of two average years, or in 50% of the average years.  Ex. 14 at GASCO 00495 & n.7.

190.     The Action Alternative did not indicate that the 18,600 cfs flow at the Jensen gauge was to be sustained for fourteen consecutive days in 50% of the average years.  Ex. 13 at GASCO 00469; Ex. 14 at GASCO 00495.

191.     The Action Alternative in the FEIS recommended that the maximum spring flow duration of 18,600 cfs at the Jensen gauge be maintained for two weeks in at least one of four average years, or in 25% of the average years.  Ex. 13 at GASCO 00469; Ex. 14 at GASCO 00495.

192.     The Action Alternative in the FEIS recommended that release from the Flaming Gorge dam allow a maximum spring flow of 8,300 cfs at the Jensen gauge in other average years and in moderately dry and dry years. Ex. 14 at GASCO 00495 & n.8.

- 31 -

193.    The Action Alternative in the FEIS defined an average year as one in which the forecasted runoff is comparable to the long-term historical average runoff volumes.  Ex. 14 at GASCO 00495 n.4.

194.    The Preliminary Jurisdictional Determination used a recurrence interval of "two to five" years in a ten year period,  rather than a recurrence interval of five years in a ten year period as stated in the Arid West Supplement.  Statistically, a "two to five" year recurrence interval is the same as an interval of two years in every ten, meaning the event has a 20 percent probability of occurring in a given year.  Ex. 2 at GASCO 00235.

195.    The Preliminary Jurisdictional Determination departed from the "five years in ten" standard based on Ms. Nall's conversations with Corps officials in other offices.  The Preliminary Jurisdictional Determination did not state, however, that the Corps had adopted a recurrence interval for the Green River that was less than the "five-years-in-ten" standard.

196.    The Preliminary Jurisdictional Determination did not explain why it was appropriate to use a "two years in ten" standard in the floodplain of the Green River.  *See generally* Ex. 2.

197.    Nall stated that there was no known written policy by any of the various Corps' offices consulted explaining why and when they deviated from the Arid West Supplement standard minimum frequency of 5 years in 10 (50 percent or higher probability) of 14-days of consecutive flooding.

198.    The Preliminary Jurisdictional Determination stated that, based on post-Flaming Gorge USGS gauge data, the 2008 spring runoff equated to a three year recurrence interval flood.  *Id.*

199.    The Preliminary Jurisdictional Determination does not contain the post-Flaming Gorge USGS gauge data that on which it bases the conclusion that the 2008 flood had a three-year recurrence interval.  The Preliminary Jurisdictional Determination does not explain why a three-year recurrence interval (an average of once every three years) satisfies the requirement of the Arid West Supplement of an average of once every two years.  *See generally* Ex. 2.

*The Corps Refuses to Provide the Entire Basis for its Preliminary Jurisdictional Determination*

200.    On or about October 2, 2008, Nall informed Gasco of her Preliminary Jurisdictional Determination in a telephone conference.  Ex. 7 at GASCO 00331.

201.    During the October 2, 2008, telephone conference, Nall did not provide to Gasco the specific reasons or basis for her Preliminary Jurisdictional Determination.

202.    On or about October 8, 2008, Gasco sent a letter to Nall proposing meetings for further discussions and requesting that Nall send a copy of the documents that contained her Preliminary Jurisdictional Determination.  Ex. 9.

203.    On or about November 4, 2008, Nall responded to Gasco's October 8, 2008, proposal for meetings and request for the documents that contained her Preliminary Jurisdictional Determination, stating that the Corps would not meet with Gasco and instructing that all request for information must be made through a formal Freedom of Information Act ("FOIA") request.  Ex. 10.

204.    On or about November 10, 2008, Gasco sent a formal FOIA request to the Corps requesting all documents relating to the Preliminary Jurisdictional Determination.

205.    On or about December 11, 2008, the Corps responded to Gasco's FOIA request and produced approximately 600 pages of materials.

206.     Among the materials produced was a copy of Nall's Preliminary Jurisdictional Determination.

207.     Key information was redacted from the Preliminary Jurisdictional Determination. *See* Ex. 2.

208.     The Corps produced black and white photocopies of the color aerial photographs that Nall relied on in her Preliminary Jurisdictional Determination.  *Id.*

*Issuance of the Compliance Order*

209.     On or about October 14, 2008, the Preliminary Jurisdictional Determination and other materials were forwarded to the EPA by the Corps.

210.     On or about October 28, 2008, the Corps sent to Gasco a notice of violation of Section 404 of the Clean Water Act.  Ex. 3.

211.     The October 28, 2008, notice ordered Gasco to cease and desist any further excavation, fill activity, and construction at the LT 12-23 well and at the access road to the LT 24-14 well.  *Id.* at GASCO 00286.

212.     After receiving the October 28, 2008, notice, Gasco did not conduct any unauthorized excavation, fill activity, or construction at the LT 12-23 well and at the access road to the LT 24-14 well.

213.     On or about September 29, 2011, the EPA issued the Compliance Order.  Ex. 4.

214.     The Compliance Order, issued in consultation with the Corps, explicitly adopted the Corps' conclusion that the LT 12-23 well was located in a wetlands adjacent to the Green River and therefore was subject to regulation under the Clean Water Act.  *Id.* at GASCO 00291, ¶ 6.

215.    The Compliance Order, issued in consultation with the Corps, explicitly adopted the Corps' conclusion that the wetlands affected by the access road to the LT 24-14 well were wetlands adjacent to the Green River and therefore was subject to regulation under the Clean Water Act.  *Id.* at GASCO 00291, ¶ 5.

216.    In a letter dated April 6, 2012, the EPA unequivocally stated that it had reviewed the Corps analysis and supports its findings.  Ex. 5 at GASCO 00309.

217.    The Compliance Order directed Gasco to:

a.    Immediately terminate all construction or other activities at the LT 12-23 well that would result in unauthorized discharge of dredged or fill material, now and in the future; and

b.    Immediately terminate all construction or other activities at the access road to the LT 24-14 well that would result in unauthorized discharge of dredged or fill material, now and in the future; and

c.    Develop and submit within 60-days to the EPA for comment, review and approval a Restoration Plan that would provide for the removal of all dredged and/or fill material that was discharged into the alleged wetlands and that would restore the alleged wetlands to its pre-impact configuration and grade.  Ex. 4 at GASCO 00295, ¶ 25; GASCO 0000296, ¶ 29.

218.    To fully satisfy the Compliance Order, Gasco would be required to plug and abandon the LT 12-23 well.

219.    The Compliance Order further advised Gasco that under section 309(d) of the Clean Water Act, it was subject to civil penalties of up to $32,500 per day for each violation of

the Clean Water Act occurring between March 15, 2004, and January 12, 2009, and civil penalties of up to $37,500 per day for each violation thereafter.  *Id.* at GASCO 00300, ¶ 41.

220.    The EPA has not provided to Gasco a copy of the complete and un-redacted basis for its conclusion that the LT 12-23 well or the access road to the LT 24-14 well is on a jurisdictional wetlands of the United States.

221.    On December 1, 2011, Gasco met with EPA and Corps officials regarding the Compliance Order in an attempt to resolve the disagreement.

222.    On April 6, 2012, the EPA sent Gasco a letter affirming its Compliance Order and setting various deadlines and directing Gasco to submit a Restoration Plan.  Ex. 5.

## COUNT I

### Violation of the 5 U.S.C. § 706 (APA)

223.    The allegations of the preceding paragraphs 1 to 222 are repeated and incorporated by reference.

224.    The EPA's Compliance Order is arbitrary and capricious, an abuse of discretion, or otherwise not supported by law because the Preliminary Jurisdictional Determination completed by the Corps and adopted by the EPA is not supported by substantial evidence:

      a.    The Corps' Preliminary Jurisdictional Determination's statement that the wetlands adjacent to the access road to LT 24-14 also is adjacent to the Green River is unsupported by any evidence;

      b.    The Corps' Preliminary Jurisdictional Determination lacks evidence showing that the wetland adjacent to the access road to LT 24-14 have a significant nexus or continuous surface connection with the Green River;

c.      The Corps' Preliminary Jurisdictional Determination's statement that LT 12-23 is adjacent to the Green River is unsupported by any evidence;

d.      The Corps' Preliminary Jurisdictional Determination lacks evidence showing that LT 12-23 has a significant nexus with the Green River;

e.      The Corps' determination that hydrophytic vegetation is present at the LT 12-23 well is not supported by substantial evidence because it relies heavily on the presence of distichlis spicata, yet fails to respond to SWCA's explanation that distichlis spicata is present because of the salt, not the water, in the ground at the LT 12-23 well;

f.      The Corps' determination that hydric soils are present at the LT 12-23 well is not supported by substantial evidence because its own analysis showed no evidence of primary hydric soil indicators;

g.      The Corps' determination that problematic hydric soils are present at the LT 12-23 well is not supported by substantial evidence because it relies on the mere possibility of red parent material, in the absence of actual proof of red parent material; the Corps' use of "conditional language in these assessments . . . suggest an undue degree of speculation, and a reviewing court must identify substantial evidence supporting the Corps' claims," *Rapanos v. United States*, 547 U.S. 715, 786 (2006) (Kennedy, J., concurring);

h.      The Corps' determination that problematic hydric soils are present at the LT 12-23 well is not supported by substantial evidence because its own

analysis shows the absence of one indicator of problematic hydric soils, namely, the presence of ferrous iron as shown by positive alpha alpha-Dipryidly test;

i.      The Corps' determination that hydric soils are present at the LT 12-23 well is not supported by substantial evidence because the Corps has failed to adequately explain the undisputed presence of intact salt deposits in the soil, speculating only that other reasons might explain the presence of salt; the Corps' use of "conditional language in these assessments . . . suggest an undue degree of speculation, and a reviewing court must identify substantial evidence supporting the Corps' claims," *Id.* (Kennedy, J., concurring);

j.      The Corps' determination that wetlands hydrology is present at the LT 12-23 well is not supported by substantial evidence because the record evidence fails to include any evidence establishing that the site was inundated for 23 days;

k.      The Corps' determination that wetlands hydrology is present at the LT 12-23 well is not supported by substantial evidence because the record fails to establish that the site was inundated for 14 consecutive days;

l.      The Corps' determination that wetlands hydrology is present at the LT 12-23 well is not supported by substantial evidence because the record fails to include any data supporting the Corps' statements regarding the historic flows and floods of the Green River;

      m.      The Corps' determination that wetlands hydrology is present at the LT 12-23 well is not supported by substantial evidence because it improperly relies on the possibility of future wetlands hydrology caused by releases consistent with the BOR's 2006 ROD for the Flaming Gorge dam and does not establish, based on past and current Green River flows, the present existence of wetlands hydrology at the LT 12-23 well in 2008;

      n.      The Corps' determination that wetlands hydrology is present at the LT 12-23 well is not supported by substantial evidence because the future releases anticipated by the BOR's 2006 ROD for the Flaming Gorge dam do not support the conclusion that wetland hydrology (at least a 50% probability of 14 consecutive days of inundation) will be present at the LT 12-23 well.

225.    The EPA's Compliance Order is arbitrary and capricious, an abuse of discretion, or otherwise not supported by law because the Preliminary Jurisdictional Determination completed by the Corps and adopted by the EPA was reached without observance of the procedures explicitly adopted by the Corps in that the Preliminary Jurisdictional Determination identified the Arid West Supplement as the source of the standards for determining whether or not the LT 12-23 well was located in a jurisdictional wetlands, but the analysis failed to apply the standards and process stated in the Arid West Supplement:

      a.      The Preliminary Jurisdictional Determination employed the special methods for determining the presence or absence of indicators in problematic areas for two of three indicators—hydric soils and wetlands

hydrology—even though the Arid West Supplement limits the use of the special methods to situations when only one of the three factors is problematic;

b. The Preliminary Jurisdictional Determination improperly used a two to five year recurrence interval when the Arid West Supplement explicitly requires use of a "five years in ten" recurrence interval where, as here, the Corps has not adopted a different standard for the area in question;

c. The Preliminary Jurisdictional Determination improperly relied on the special method for determining problematic wetlands hydrology, direct hydrological monitoring, without actually completing the direct monitoring.

d. The Preliminary Jurisdictional Determination is arbitrary in concluding that the Lamb Trust area is problematic within the meaning of the Arid West Supplement.   The Determination does not rely on any reasons permitted by the Corps' Arid West Supplement.  Instead, it says the area is problematic simply because it is "arid."  That is clear error.  The Arid West Supplement only applies in "arid" areas, so "aridity" cannot be an exception allowing departure from the three indicators, or the exception would swallow the rule.

e. The Preliminary Jurisdictional Determination is arbitrary in concluding that the Lamb Trust area is an atypical area because it has been recently disturbed by human activity.  The samples gathered by the Corps were all

taken in areas not disturbed by Gasco. If the Corps is relying on disturbance by cattle grazing, it failed to follow the procedures of the Arid West Supplement to determine if the grazing materially changed the area's vegetation. *See* Ex. 11 at GASCO 00431.

226.    The EPA's Compliance Order is arbitrary and capricious, an abuse of discretion, or otherwise not supported by law because the Preliminary Jurisdictional Determination completed by the Corps and adopted by the EPA is contrary to constitutional right, power, or privilege:

> a.    The Corps and the EPA have denied Gasco due process of law by refusing to disclose the full basis of their decision due to redactions of material information from the documents produced in response to Gasco's November 10, 2008, FOIA request;

> b.    The Corps and the EPA have denied Gasco due process of law by failing to adequately explain the basis for the Preliminary Jurisdictional Determination's disagreements with SWCA's conclusions that the distichlis spicata served as a halophyte, that the intact salt concentrations indicated the area was not frequently flooded, and that the spring 2008 flood of the Green River was not an event that happens in five out of ten years.

227.    The Preliminary Jurisdictional Determination and Compliance Order are arbitrary and not based on substantial evidence for additional reasons identified in this Complaint or which will be revealed when the EPA produces the complete administrative record.

- 41 -

## COUNT II

### Violation of the Due Process Clause

228.    The allegations of the preceding paragraphs 1 to 227 are repeated and incorporated by reference.

229.    The EPA's Compliance Order violates the due process clause of the Fifth Amendment because:

      a.      The Corps and the EPA have refused to disclose to the full basis of the Preliminary Jurisdictional Determination and instead redacted key information; and

      b.      The Corps and the EPA have relied on facts and information, such as data regarding the historic flows of the Green River and the BOR 2006 ROD, but have not included the data in the record supporting the Preliminary Jurisdictional Determination.

### REQUESTED RELIEF

Gasco requests that the Court enter a final judgment that:

1.    The Compliance Order is arbitrary, without support in substantial evidence, and otherwise contrary to law;

2.    The Preliminary Jurisdictional Determination is arbitrary, without support in substantial evidence, and otherwise contrary to law;

3.    The Compliance Order and the Preliminary Jurisdictional Determination are vacated; and

4.    Further relief as this Court may deem just and equitable shall be ordered.

Date:  June 25, 2012    Respectfully submitted,

        By   /s/ *L. Poe Leggette*        
          L. Poe Leggette
          pleggette@fulbright.com
        Fulbright & Jaworski L.L.P.
        One Tabor Center
        1200 17th Street, Suite 1000
        Denver, CO 80202-5835
        Tel:    (303) 801-2700
        Fax:    (303) 801-2777

        *Attorneys For Plaintiff Gasco Energy, Inc.*

- 43 -