**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:12-CV-1658-MSK-BNB

GASCO ENERGY, INC.,

     Plaintiff,

v.

ENVIRONMENTAL PROTECTION AGENCY,

     Defendant.

-------------------------------------------------------------------

UNITED STATES OF AMERICA,

     Counterclaim-Plaintiff,

v.

GASCO ENERGY, INC.,

     Counterclaim-Defendant.

_____

**UNITED STATES' CORRECTED MEMORANDUM IN OPPOSITION TO
GASCO ENERGY INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT[1]**

_____

---

[1]    The United States submits this corrected memorandum to provide internal page references at four "*supra*" citations, at pages 32, 42, 43, and 44, that were not included in the memorandum filed October 4, 2013, Dkt. No. 63.

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................... 1

BURDEN OF PROOF ............................................................................. 3

STATUORY AND REGULATORY BACKGROUND .................................. 6

    I.    The Clean Water Act ................................................................. 6

    II.    Wetlands Determinations ....................................................... 8

FACTUAL BACKGROUND ...................................................................... 10

STANDARD OF REVIEW ......................................................................... 16

ARGUMENT .............................................................................................. 18

    I.    Substantial Evidence in the Administrative Record Supports EPA's Finding that the Well Pad and Access Road for Well #12-23 Were Constructed in Wetlands Within the Regulatory Jurisdiction of the Clean Water Act ............................................................ 20

        A.  Substantial Evidence Supports EPA's Finding that the Well Pad and Access Road for Well #12-23 Were Constructed in Wetlands Based Upon the Presence of Hydrophytic Vegetation .................................................................. 20

        B.  Substantial Evidence Supports EPA's Finding that the Well Pad and Access Road for Well #12-23 Were Constructed in Wetlands Based on the Presence of Hydric Soils. ................................. 26

        C.  Substantial Evidence Supports EPA's Finding that the Well Pad and Access Road for Well #12-23 Were Constructed in Wetlands Based on the Presence of Wetland Hydrology ............... 30

    II.    Substantial Evidence in the Record and Applicable Law Support EPA's Finding that the Wetlands Associated with Wells #12-23 and #24-14 are Regulated under the Clean Water Act because They Are Adjacent to the Green River. ............................................... 38

        A.    Wetlands Adjacent to Traditional Navigable Waters Are Subject to Regulation under the Clean Water Act. ................... 39

B.     The Administrative Record supports EPA's Finding
that the Wetlands Are Adjacent to the Green River.......................... 42

CONCLUSION ......................................................................................................45

## INTRODUCTION

Gasco Energy, Inc. (Gasco) initiated this case by filing a petition for review under the Administrative Procedure Act that sought judicial review of a Findings of Violation and Administrative Order for Compliance (Compliance Order) that the U.S. Environmental Protection Agency (EPA) issued to Gasco under the Clean Water Act.  The Compliance Order found that Gasco filled wetlands adjacent to the Green River near Vernal, Utah associated with the drilling of two natural gas wells. In response to Gasco's petition for review, the United States filed two counterclaims to enforce the requirements of the Clean Water Act against Gasco arising from the same activities.  The first counterclaim asserts a violation of Clean Water Act section 301, 33 U.S.C. § 1311, based upon Gasco's filling of wetlands within the regulatory jurisdiction of the Clean Water Act.  The second counterclaim asserts that Gasco violated the Compliance Order issued by EPA based upon Gasco's failure to comply with the Compliance Order's requirements.  Gasco's motion for partial summary judgment addresses one element of the second counterclaim, and requires this Court to engage in judicial review under the Administrative Procedure Act.

Gasco drilled the two natural gas wells (designated as the #12-23 and the #24-14 wells) in the floodplain of the Green River at a location designated as critical habitat for four species of fish listed as endangered under the federal Endangered Species Act.  Although the land on which Gasco drilled its wells is privately owned by the Lamb Trust, the land is subject to a conservation easement purchased at considerable expense by the United States Fish & Wildlife Service for the purpose of

1

preserving critical habitat for the endangered fish species that inhabit this reach of the Green River.

Substantial evidence in the administrative record supports EPA's Compliance Order.  EPA found that Gasco filled regulated wetlands when it constructed an access road and well pad for well #12-23.  EPA also determined that Gasco filled regulated wetlands when it constructed an access road to well #24-14. In making its findings, EPA relied in large part on the wetlands determination of Ms. Susan Nall, an employee of the U.S. Army Corps of Engineers (Corps), who made four visits to the site in 2008 before making her wetlands determination. Wetland determinations are made in accordance with applicable guidance issued by the Corps.  A wetland determination under the Clean Water Act generally requires an assessment of the presence of hydrophytic vegetation, hydric soils, and hydrology.  Ms. Nall applied the appropriate regulations and guidance, evaluated relevant vegetation, soils and hydrology, and determined that Gasco constructed the well pad and two access roads in wetlands subject to the regulatory jurisdiction of the Clean Water Act.  Consultants employed by Gasco came to a contrary conclusion based, in part, on a misapplication of Corps guidance.  The administrative record contains substantial evidence, including Ms. Nall's wetlands determination, and EPA's reliance on that determination was not arbitrary, capricious, an abuse of discretion or contrary to law.



Wellhead #12-23, AR 2908.

## BURDEN OF PROOF

Gasco presents a procedurally unusual motion.  Gasco requests summary judgment on the United States' second counterclaim, which seeks to enforce the Compliance Order that EPA issued to Gasco.  Typically, this type of enforcement claim requires the United States to establish two elements:  (i) that the recipient of the Compliance Order violated the Clean Water Act; and (ii) that the recipient failed to comply with the Compliance Order.  *See United States v. Brace*, 41 F.3d 117, 124-29 (3d Cir. 1994) (considering compliance-order recipient's challenges to the agency's authority to regulate in the context of an enforcement action).  In this case, Gasco challenges the validity of the Compliance Order as a separate element

3

from whether Gasco violated the Clean Water Act.  Gasco's motion for partial summary judgment focuses solely on its challenge to the validity of the Compliance Order.

Gasco's challenge to the validity of the Compliance Order asserts a challenge to final agency action that is reviewed under the standard and scope of review provided by the Administrative Procedure Act (APA).  *See Sackett v. EPA*, 132 S.Ct. 1367, 1374 (2012).  Gasco, in its discussion of the standard of review, acknowledges the applicability of the APA.  Gasco Motion at 4-5.  Under the APA, Gasco has the burden of proof to establish that the Compliance Order was unlawful.  *Western Watersheds Project v. Bureau of Land Management*, 721 F.3d 1264, 1273 (10th Cir. 2013); *Union Oil Co. of Calif. v. Reiger*, 2009 WL 890719 at *2 (D. Colo. 2009) (party challenging agency action bears the burden of proof).  Thus, Gasco has the burden of proof on its motion for partial summary judgment.

Because Gasco is seeking partial summary judgment on a claim subject to judicial review under the APA, typical summary judgment procedures are not directly applicable.  Gasco's argument is reviewed on the administrative record filed by EPA, so there are no disputed facts to be resolved by this Court.  *See Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1579-80 (10th Cir. 1994).  As a consequence, Gasco's motion is analogous to an appellate brief, and the United

States' responds accordingly.  *Id.*[2]  In addition, because Gasco's arguments under the APA in support of its motion for summary judgment address the same issues raised in its own petition for review, this briefing should also be dispositive of Gasco's petition for review.[3]

The early filing of Gasco's motion to resolve its challenge to the validity of the Compliance Order also presents unusual timing issues.  The United States previously sought to have the Court adopt a schedule that would have provided for the briefing of the APA challenge to the Compliance Order at the close of discovery, at the time dispositive motions are typically filed.  The United States sought this schedule because the fundamental dispute between the parties – whether Gasco's activities violated the Clean Water Act – will only be fully resolved by the Court's adjudication of the United States' first counterclaim, not by a determination of the validity of the compliance order.  *See* Dkt No. 14.  The Scheduling Order did not adopt the United States' position and did not preclude Gasco from filing its summary judgment when it did.  However, the granting of Gasco's partial summary judgment motion on the United States' second claim will not reduce the scope of evidence to be presented at trial on the United States' first counterclaim (not

---

[2]     The United States is aware of the Court's preferred format for summary judgment briefing, but this format addresses more typical motions for summary judgment that address claims in which the Court is the trier of fact, not those addressing claims reviewed under the APA.  *See Olenhouse,* 42 F.3d at 1579-80.

[3]     Gasco notes that if the Court finds that the Compliance Order is unlawful, then it should enter judgment in Gasco's favor on Gasco's petition for review.  Gasco Motion at 2 n.1.  Correspondingly, if the Court denies Gasco's motion for partial summary judgment, it should also enter judgment in EPA's favor on Gasco's petition for review.

limited to the administrative record) to establish that Gasco discharges of fill material violated the Clean Water Act.  *See* Civil Procedures of Judge Marcia Krieger at 13 (motions for partial summary judgment on some, but not all legal theories arising from a single factual scenario are not favored unless, if granted, the scope of evidence to be presented at trial will be significantly reduced.).

## STATUORY AND REGULATORY BACKGROUND

### I.     The Clean Water Act.

Congress enacted the Clean Water Act in 1972 with the expressed objective to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To achieve this goal, Congress prohibited the "discharge of any pollutant" to the waters of the United States unless that discharge complies with the Clean Water Act.  *See* 33 U.S.C. § 1311(a).

These statutory terms of liability are defined in the Act.  The phrase "discharge of a pollutant" is broadly defined to mean "any addition of any pollutant to navigable waters from any point source . . . ."  33 U.S.C. § 1362(12).  The definition of "pollutant" includes dredged spoil, rock, and sand discharged into water.  33 U.S.C. § 1362(6).

The Act defines the phrase "point source" as any "discernible, confined and discrete conveyance . . .  from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

The Act defines "navigable waters" as "waters of the United States."  33 U.S.C. § 1362(7).  The phrase "waters of the United States" includes all waters

currently used, used in the past, or may be susceptible to use in interstate commerce, all interstate waters, and wetlands adjacent to those waters and their tributaries.  33 C.F.R. § 328.3(a).

The Corps and EPA define "adjacent" as "bordering, contiguous or neighboring.  Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are 'adjacent wetlands.'" 33 C.F.R. § 328.3(c); 40 C.F.R. § 230.3(b).

Both the Corps and the EPA have responsibilities under the Clean Water Act with respect to discharges of dredged or fill material to waters of the United States. Congress granted to the Corps the authority to issue permits for the discharge of dredged or fill material into waters of the United States.  33 U.S.C. § 1344. Congress granted to EPA the general authority to initiate enforcement actions for discharges of dredged and fill material without a permit.  *See* 33 U.S.C. § 1319(a), (b) and (d).  Both the Corps and EPA have promulgated regulations to interpret provisions of the Clean Water Act.

The Clean Water Act provides EPA with several enforcement options in the event EPA determines that a person has violated the Clean Water Act.  If EPA finds that a person is in violation of the prohibition on discharging a pollutant without a permit, EPA shall issue an order requiring such person to comply with the Act.  33 U.S.C. § 1319(a)(3).  Alternatively, EPA can bring a civil action for appropriate relief, including a permanent or temporary injunction, and the imposition of civil penalties.  33 U.S.C. § 1319(b)(d).

## II.    Wetlands Determinations

The Corps and EPA regulations define wetlands as "[t]hose areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions.  Wetlands generally include swamps, marshes, bogs and similar areas."  33 C.F.R. § 328.3(b); 40 C.F.R. § 230.3(t).

EPA has provided further regulatory explanation of the physical components of wetlands:  "Wetland vegetation consists of plants that require saturated soils to survive (obligate wetland plants) as well as plants, including certain trees, that gain a competitive advantage over others because they can tolerate prolonged wet soil conditions and their competitors cannot. In addition to plant populations and communities, wetlands are delimited by hydrological and physical characteristics of the environment."  40 C.F.R. § 230.41(a)(3).

When making determinations of wetlands, as defined by the Clean Water Act's regulations, both EPA and the Corps use the 1987 U.S. Army Corps of Engineers Wetlands Delineation Manual ("1987 Manual"), which has been updated by regional supplements issued by the Corps.  The 1987 Manual provides "guidelines and methods to determine whether an area is a wetland for purposes of section 404 of the [Clean Water] Act." AR 4147.  The 1987 Manual is premised on the regulatory definition of wetlands, but is not itself a regulation with the force of law.  *See United States v. Ellen*, 961 F.2d 462, 466 (4th Cir. 1992).

The 1987 Manual fleshes out what is commonly known as the "three-parameter approach," a method for identifying wetlands that requires examination of the three parameters – hydrology, vegetation, and soils -- identified in the regulatory definition of wetlands. AR 4155.  Accordingly, the 1987 Manual identifies three wetlands diagnostic characteristics: (1) wetlands hydrology; (2) wetlands (or "hydric") soils; and (3) wetlands (or "hydrophytic") vegetation. AR 4155-56. Normally, all three indicators must be present for an area to be identified as a wetland.  AR 4156.

In December 2006, the Corps issued a supplement to the 1987 Manual that provided additional technical guidance and procedures for identifying and delineating wetlands for use in the arid west, including Utah.  *See* Interim Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Arid West Region ("Arid West Supplement").  The Arid West Supplement is one of a series of regional supplements that account for regional differences in climate, soils, hydrology, plant communities and other factors that are important to the identification of wetlands.  AR 4023.  The Arid West Supplement constituted part of the Corps effort to address regional wetland characteristics and improve the accuracy and efficiency of wetland delineation procedures in areas characterized by a predominantly dry climate and a long summer dry season.  AR 4025.  Where differences between the 1987 Manual and the Arid West Supplement occur, the Arid West Supplement takes precedence over the 1987 Manual for applications in the Arid West Region.  AR 4023.

## FACTUAL BACKGROUND

The Green River in its reach next to the Lamb Trust property is part of the Upper Colorado River Endangered Fish Recovery Program, established in 1988 to protect the Colorado pikeminnow, humpback chub, razorback sucker and bonytail. *See* AR 0493; AR 1251-52.  The United States Fish and Wildlife Service (FWS) identified each of these fish as an endangered species.  *See* AR 1871.  As part of the Endangered Fish Recovery Program, the FWS purchased in 2000 for $112,000 a perpetual flowage easement to intermittently and completely seep, flood, overflow and inundate the Lamb Trust property to permanently enhance and protect flooded bottomland for endangered fish species in the Colorado River basin.  AR 0059, 0065.  Flooded bottomlands are important habitat for the endangered fish because they provide nutrient input and juvenile rearing habitat within the river system.  AR 1871.

Prior to Gasco's construction of the well pad and access roads associated with well #12-23 and #24-14, Gasco obtained from the FWS special use permits to drill the wells within the boundary of the easement.  AR 612, 1751.  The special use permit required that all exploration and production comply with all federal laws. AR 612, 1751.

In January 2008, the FWS notified the Corps of the construction of a well pad on the Lamb Trust property that the FWS indicated might be located in wetlands subject to the regulatory jurisdiction of the Clean Water Act.  *See* AR 2671.  Ms. Nall, an environmental engineer employed in the Corps' office in Grand Junction,

Colorado, initially visited the site on February 29, 2008.  AR 2673.  On that visit, snow cover prevented any meaningful assessment of regulatory jurisdiction. AR 2673.  Ms. Nall subsequently visited the site on June 2, June 20 and July 9, 2008. AR 2671, 2673.  In addition, Ms. Nall compiled information from soil surveys, aerial photography, weather data, Green River flow data, and stream flow analysis.  AR 2671-72.  She also consulted employees with other Corps offices and the offices of other federal agencies.  AR 2672, 2674.  Based on the site visits and the additional information Ms. Nall compiled, she determined that Gasco placed dredged or fill material into wetlands subject to the regulatory jurisdiction of the Act in connection with the construction of the well pad for well #12-23 and its associated access road, and a portion of the access road to well pad #24-14.  AR 2674-75.

Ms. Nall acknowledged that the site was both problematic and atypical as those terms are used in the Arid West Supplement.  AR 2672.  A problem area wetland is defined as a naturally occurring wetland in the arid west that periodically lacks indicators of hydrophytic vegetation, hydric soils, or wetland hydrology due to normal seasonal or annual variability.  AR 2672.  Some problem wetland areas may permanently lack certain indicators due to the nature of the soils or plant species on the site.  AR 2672.  An atypical situation is defined as wetlands in which vegetation, soil, or hydrology indicators are absent due to recent human activities, such as dredging or filling, or natural events.  AR 2672.  In this case, the grading and earthmoving associated with construction of the well pads and associated roads removed the pre-existing vegetation and disturbed the soils.

11

With respect to well #12-23, Ms. Nall applied the procedures set forth in the Arid West Supplement to determine that the well pad and the associated access road were constructed in a water of the United States.  AR 2673.  Regarding vegetation, Ms. Nall surveyed the plant species at four sampling points (P1, P2, P3 and P4) adjacent to and surrounding the well pad.  AR 2685, 2686, 2688, 2690, 2692.  At each sampling point Ms. Nall recorded the species present and the percentage of land each species covered.  *See* AR 2686, 2688, 2690, 2692.  In accordance with the procedures discussed in the Arid West Supplement, Ms. Nall performed the calculations outlined in the "dominance test" and determined that the vegetation at each of the four sampling points met the parameter for hydrophytic vegetation.  *Id.*

Ms. Nall also determined that the well pad and access road at well #12-23 possessed hydric soils.  AR 2687, 2689, 2691, 2693.  The Natural Resources Conservation Service of the U.S. Department of Agriculture previously mapped the soils at the site.  AR 2201-05.  The two silty clay loams comprising 90 percent of the site area are included on the Utah and National lists of hydric soils.  AR 2204; AR 2638; *see* AR 2674.  Further, the site is located at a lower elevation depression in the floodplain on the Lamb Trust property.  *See* AR 2893.  Based on the site location, soil mapping and landscape positions, Ms. Nall determined that the soils at the well pad are problematic hydric soils under the Arid West Supplement.  AR 2674.

Finally, Ms. Nall determined that the site of the #12-23 well pad and access road possessed wetland hydrology.  Ms. Nall identified numerous indicators of hydrology during her visits to the site in 2008.  The well pad site was inundated for at least 23 days during spring runoff, from May 23, 2008, through June 14, 2008, including the date of one of her visits.  AR 2673.  Ms. Nall observed additional wetland hydrology indicators, including surface soil cracks, water marks, sediment deposits, drift deposits and drainage patterns.  AR 2687, 2689, 2691, 2693.  Ms. Nall determined that the spring runoff of 2008 was fairly representative of ordinary seasonal flows based on her review of historic flow data.  AR 2673.  She also considered the operational parameters for water releases from Flaming Gorge Dam, an upstream dam that regulates flow in the Green River, including the revised flow operational parameters initiated in 2006 to increase the frequency of larger flows during average water years to enhance habitat for the endangered species of fish. AR 2673.

Ms. Nall also determined that Gasco filled a portion of a wetland when constructing an access road to well #24-14.  She relied upon a wetland delineation performed by one of Gasco's consultants, SWCA Environmental Consultants (SWCA).  AR 2672.  According to SWCA, the four sampling points taken adjacent to the filled access road to well # 24-14 indicated that the area was an emergent marsh.  AR 2369.  The soil samples possessed indicators demonstrating that the soils were hydric.  AR 2369; *see*, e.g. AR 2396-99 (data forms for sampling points taken adjacent to the access road).  SWCA observed a high water table at the site,

reflecting wetland hydrology, and also documented hydrophytic vegetation. *Id.* SWCA determined that 0.08 acre of wetlands was impacted by the access road to well #24-14. AR 2372.

SWCA did not identify any other area of jurisdictional wetlands within or adjacent to areas where Gasco's gas exploration activities occurred. AR 2364. With respect to the well pad and access road associated with well #12-23, SWCA determined that the site lacked all three parameters to be classified as a wetland. SWCA utilized five sample points to make its determination. AR 2370. SWCA noted that four of the five sample points had indicators of wetland hydrology. AR 2369. However, SWCA attributed these hydrologic indicators to the relatively high runoff that occurred during 2008 that it believed was unrepresentative of typical conditions. AR 2369. It determined that well pad #12-23 did not possess hydrophytic vegetation. AR 2370. SWCA also determined that the soils did not possess indicators of hydric soils. AR 2370.

Gasco also hired Buys and Associates ("Buys") to conduct a wetland delineation of the well #12-23. Buys employed the vegetation dominance test and determined that the site of well pad #12-23 possessed hydrophytic vegetation. AR 2834, 2836. Buys found that the location of well pad #12-23 lacked hydric soils and wetland hydrology. AR 2835-36. Buys concluded, based on the absence of two of the three wetland indicators that well pad #12-23 was not a wetland. AR 2836.

The Corps and EPA reviewed the reports prepared by SWCA and Buys. AR 2672. The information submitted by Gasco's two consultants did not persuade the

Corps or EPA that Gasco constructed the well pad and access road for well #12-23 at an upland location.  AR 2674-75; AR 1249-50.  In October 2008, the Corps sent Gasco a "cease and desist" letter that informed Gasco of the Corps' determination that Gasco discharged dredged or fill material into wetlands adjacent to and abutting the Green River associated with the fill for the access road to well #24-14 and the well pad and access road for well #12-23.  AR 1457-58.  The Corps directed Gasco to "cease and desist any further excavation, fill activity, and construction within waters of the United States at this site until the violation is resolved."  AR 1457.  The letter also informed Gasco that the matter would be referred to the EPA for review and any enforcement action the EPA may wish to pursue.  AR 1457.

On September 29, 2011, EPA issued the Compliance Order to Gasco.  AR 1244, 1249-60. [4]  EPA found, based in part on the Corps' determinations, that Gasco discharged dredged or fill material into wetlands adjacent to the Green River in conjunction with Gasco's construction of the access road to well #24-14.  AR 1249-50.  EPA also found Gasco discharged dredged or fill material into approximately 2.2 acres of wetlands adjacent to the Green River in conjunction with Gasco's construction of the well pad and access road for well #12-23.  *Id.*  EPA found that

---

[4]      Gasco implies, Gasco Motion at 16-19, that EPA refused to communicate and meet with Gasco's representatives during the United States' investigations.  Although this issue is irrelevant to the legal issues presented in Gasco's motion, EPA met with Gasco three times between the Corps' referral of the matter to EPA and EPA's issuance of the Compliance Order.  *See* AR 1788 (site meeting September 17, 2009); AR 1854 (meeting April 21, 2010); (a meeting on September 1, 2010, is not documented in the administrative record).  In addition, Ms. Nall reviewed and commented on a draft of SWCA's report before making her wetland delineation findings.  *See* AR 1672.  EPA also communicated with Gasco by email and phone numerous times during this period. *See* e.g., AR 1534, 1840, 1841.

these wetlands were adjacent to the Green River which is a navigable, interstate water.  AR 1250.  As a result, Gasco's activities required prior authorization from the Corps, which the Compliance Order found had not been sought or granted.  AR 1251.  EPA concluded that Gasco's activities violated section 301 of the Clean Water Act, 33 U.S.C. § 1311.  AR 1253.

Based upon EPA's findings of violation, EPA ordered Gasco to submit to EPA, within 60 days of receipt of the Compliance Order, a restoration plan that provided for the: (1) removal of all dredged or fill material that was discharged into wetlands at the site; and (2) restoration, to their pre-impact configuration and grade, of the wetlands that were impacted as a result of Gasco's unauthorized discharges of dredged and/or fill material at the Site.  AR 1255.  The Compliance Order specified the components of an appropriate restoration plan. AR 1255-56.  Gasco did not submit to EPA a proposed restoration plan for EPA's review and approval.

## STANDARD OF REVIEW

This Court's review of the Compliance Order is governed by the deferential standard set forth in the Administrative Procedure Act, 5 U.S.C. §§ 701-706.  EPA's Compliance Order is valid and should be upheld unless Gasco can demonstrate that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This standard "is a narrow one," under which the Court is not "to substitute its judgment for that of the agency."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  Rather, in conducting its review for arbitrary and capricious action, this Court must ascertain whether EPA

16

examined the relevant data and articulated a rational connection between the facts found and the decision made. *Union Oil Co. of Calif. v. Reiger*, 2009 WL 890719 at *2 (D. Colo. 2009). The Court must ensure that the decision was not a "clear error of judgment." *Id.* An agency's action must be upheld on the basis articulated by the agency, but the court will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. *See Bowman Transp., Inc., v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). A presumption of validity attaches to the agency's decision. *Union Oil Co.,* 2009 WL 890719 at *2.

The "arbitrary or capricious" standard also requires that an agency action be supported by "substantial evidence" in the administrative record. *Colorado Wild v. United States Forest Service*, 435 F. 3d 1204, 1213-14 (10th Cir. 2006). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* "This is something more than a mere scintilla but something less than the weight of the evidence." *Id.* (quoting *Foust v. Lujan*, 942 F.2d 712,714 (10th Cir. 1991). "Evidence is generally substantial under the APA if it is enough to justify, if the trial were to a jury, refusal to direct a verdict on a factual conclusion." *Colorado Wild*, 435 F.3d at 1213 (*quoting Hoyl v. Babbitt*, 129 F.3d 1377, 1383 (10th Cir. 1997)). Consequently, the Court should not determine which of two conflicting views of the facts is correct; rather, the court should uphold the agency action if there is substantial evidence in the administrative record to support the agency action. See *Colorado Wild*, 435 F.3d at 1213-14.

Further, this Court "must give substantial deference to an agency's interpretation of its own regulations." *Morris v. U.S. Nuclear Regulatory Comm'n*, 598 F.3d 677, 684 (10th Cir. 2010). An agency's interpretation of its own regulations must "be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Id.*; *see Ariz. Pub. Serv. Co. v. U.S. EPA*, 562 F.3d 1116, 1123 n.5 (10th Cir. 2009). Broad deference is particularly appropriate when, as here, a regulation concerns "a complex and highly technical regulatory program, in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." *Morris*, 598 F.3d at 684.

Finally, this Court's deference to an agency's decision is "most pronounced" when the challenged decision involves technical or scientific matters within the agency's area of expertise. *Western Watersheds Project*, 721 F.3d at 1273. *WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1183 (10th Cir. 2013); *see Colorado Wild*, 435 F.3d at 1216 ("our deference to the agency is greatest when reviewing technical matters within its area of expertise"). Agencies are entitled to rely on the opinions of their experts so long as these conclusions are not arbitrary and capricious. *Colorado Wild*. 435 F.3d at 1214. Further, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinion of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive. *San Juan Citizens Alliance v. Stiles*, 654 F.3d 1038, 1057 (10th Cir. 2011). The "possibility of drawing two inconsistent conclusions

from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *National Cattlemen's Assoc. v. EPA*, 773 F.2d 268, 271 (10th Cir. 1985).

## ARGUMENT

In order to assert the elements of a Clean Water Act violation in the Compliance Order against Gasco, EPA had to find that Gasco is a person that (i) discharged a pollutant, (ii) from a point source, (iii) to a water of the United States, (iv) without a Clean Water Act section 404 permit. *United States v. Hubenka*, 438 F.3d 1026, 1035 (10th Cir. 2006); *Sierra Club v. El Paso Gold Mines, Inc.,* 421 F.3d 1133, 1141-42 (10th Cir. 2005). Gasco, in its motion for partial summary judgment, does not challenge EPA's findings in the Compliance Order that it is a person under the Clean Water Act. Gasco does not challenge EPA's findings that it discharged a pollutant from a point source. It also does not contest that it constructed the well pad and access roads without obtaining a Clean Water Act permit authorizing the work. Gasco does not contest the Corps' determination, based on Supreme Court precedent, that the Green River is a traditional navigable water and thus a water of the United States under the Clean Water Act. Gasco Motion at 10; *See United States v State of Utah*, 283 U.S. 64 (1931) (identifying navigable reaches of the Green River to include the reach adjacent to the Lamb Trust property). Gasco challenges only EPA's finding that the locations of the access road and well pad for well #12-23 are wetlands that satisfy the vegetation, soils, and hydrology parameters, and whether these wetlands associated with well #12-23 and the

19

wetlands associated with the access road to well #24-14 are adjacent to the Green River.  Substantial evidence supports EPA's findings at both locations.

I.   **Substantial Evidence in the Administrative Record Supports EPA's Finding that the Well Pad and Access Road for Well #12-23 Were Constructed in Wetlands Within the Regulatory Jurisdiction of the Clean Water Act.**

A.   **Substantial Evidence Supports EPA's Finding that the Well Pad and Access Road for Well #12-23 Were Constructed in Wetlands Based Upon the Presence of Hydrophytic Vegetation.**

The administrative record contains ample evidence supporting EPA's finding that hydrophytic vegetation was present at the access road and well pad for well #12-23.  The Corps, using the methods set forth in the Arid West Supplement, found that hydrophytic vegetation was present at all four sampling points surrounding the disturbed well pad site.  Buys, one of Gasco's consultants, similarly determined that hydrophytic vegetation was present at the four sampling points it examined adjacent to the well pad.  Gasco's other consultant, SWCA, determined that hydrophytic vegetation was present at two of its five sampling sites and its conclusion from one of the other three points was based on a misapplication of the Arid West Supplement methodology.  Further, SWCA's assessment of saltgrass as a "false positive" indicator, which differed from both the Corps' and Buys' assessment, was contrary to applicable guidance and does not undercut the substantial evidence supporting the Corps' determination of hydrophytic vegetation.

Hydrophytic vegetation is the community of plants that occur in areas where inundation or soil saturation is either permanent or of sufficient frequency and duration to exert a controlling influence on the plant species present.  AR 4039.  A

determination of hydrophytic vegetation involves three steps.  First, the investigator identifies the plant species at a site.  Second, the investigator classifies the plants using one of five classifications that reflect the plants' suitability to saturated conditions.  These plant classifications are obligate (OBL), facultative wetland (FACW), facultative (FAC), facultative upland (FACU) and upland (UPL).  AR 4160; AR 4039.  An OBL plant species occurs almost always in wetlands under natural conditions.  AR 4160.  A plant classified as FACW occurs usually (67 to 99 percent) in wetlands but may also be present in nonwetlands.  *Id.*  A FAC plant possesses a similar likelihood of occurring in both wetlands and nonwetlands.  *Id.*  FACU plant species occur sometimes (1 to 33 percent) in wetlands and UPL plant species occur rarely in wetlands.[5]  *Id.*

At the third step, the investigator applies the "dominance test" to determine whether the majority of the dominant plant species at the site are OBL, FACW or FAC.  AR 4041. The Arid West Supplement contains the procedure for performing the dominance test.  AR 4041-42.  The dominant species are chosen independently from each stratum of the plant community (i.e. trees, shrubs, herbs).  In general, dominants are the most abundant species that individually or collectively account for more than 50 percent of the vegetation in the stratum, plus any other species that, by itself, accounts for at least 20 percent of the total.  AR 4042.  The list of

---

[5]     Plant classifications are contained in a national list of plant species that occur in wetlands.  The national plant list identifies the classification of hundreds of plant species.  At the time of the wetland delineations performed in Utah, the applicable plant list was found in a list prepared by the U.S. Fish and Wildlife Service in 1988.  *See* AR 4035, 4122.

dominant species is combined across all strata and the investigator classifies each species as OBL, FACW, FAC, FACU or UPL.  AR 4041.  If the percentage of dominant species that are OBL, FACW, or FAC exceeds 50 percent, the plant community is hydrophytic.  AR 4041.

Ms. Nall performed an assessment of vegetation at well pad #12-23 on June 20, 2008 using the dominance test described in the Arid West Supplement.[6] Because the well pad site and access road were disturbed and no plants grew on the fill placed to construct the pad and road, Ms. Nall located four sampling points in adjacent areas in accordance with Corps guidance, each in a different direction around the periphery of the pad.  *See* AR 2685; see AR 4222.  At each of the four sites surrounding the well pad, Ms. Nall determined that the dominance test was satisfied.  At point 1, Ms. Nall identified three dominant species, two of which were FACW or FAC.  AR 2686.  At point 2, she identified four dominant species, three of which were FACW and one was FAC.  AR 2688.  Ms. Nall identified three dominant species at Point 3, two of which were FACW or FAC.  AR 2690.  Finally, she identified two dominant species at Point 4, both of which were FACW or FAC.  AR 2692.  In conclusion, Ms. Nall's assessment of vegetation at the site provided persuasive evidence that the site possessed hydrophytic vegetation.

Gasco's consultant Buys also performed a dominance test for vegetation and concluded, like Ms. Nall, that the site met the test for hydrophytic vegetation.

---

[6]  Ms. Nall also observed vegetation during her visit on July 9, 2008, and her observations were consistent with her visit on June 20, 2008. Contrary to Gasco's assertion, Gasco Motion at 29, Ms. Nall recorded her observations and her handwritten notes are in the administrative record.  AR 0422-23.

Buys, like Ms. Nall, selected four sites surrounding the well pad fill for purposes of evaluating vegetation.  AR 2837.  At each of the four sites, Buys identified five dominant species, four of which were OBL, FACW or FAC.  AR 2847, 2849, 2851, 2853.  Based on its evaluation, Buys concluded that hydrophytic vegetation was present at all four sites.  AR 2834-35.

Because Buys' conclusions on vegetation do not support Gasco's position, Gasco relies instead on the determinations made by SWCA.  However, SWCA's findings also support the presence of hydrophytic vegetation.  Five of SWCA's sampling points are relevant to well #12-23 – three along the access road to the well (SP18, SP19, and SP20), one to the north of the well pad (SP23), and one to the south of the well pad (SP24).  AR 2369.  SWCA found hydrophytic vegetation present based upon the dominance test at two of the five sampling points, SP19 and SP23, based upon a dominance of OBL, FACW and FAC plants.  AR 2416, 2424. SWCA's assertion that hydrophytic vegetation is not present at SP18 is based on a misapplication of the dominance test.  At SP18, SWCA did not list *tamarix ramosissima*, a shrub with an indicator of FACW and the only species identified in the sapling/shrub stratum, as a dominant species.  AR 2414.  However, under the dominance test, all species *in each stratum* should be classified as dominant until cumulative coverage exceeds 50 percent.  AR 4042. *Tamarix ramosissima is* a dominant species as the primary sapling/shrub at SP18.[7]  With this correction, 67

---

[7]     SWCA also failed to consider tamarix ramosissima at SP 19.  If it had, the dominance test would have yielded 80% rather than 66.7% FAC, FACW, or OBL species.

percent of the dominant species at SP18 are OBL, FACW, or FAC, and the dominance test is satisfied.[8]

Thus, overall, of the 13 sampling points evaluated by the Corps, Buys or SWCA, 11 possessed hydrophytic vegetation.  More than sufficient substantial evidence in the record supports EPA's finding that the well pad possessed hydrophytic vegetation.

Gasco also challenges EPA's finding of hydrophytic vegetation based upon the classification of saltgrass (*Distichlis spicata*) as a hydrophytic plant at this location, Gasco Motion at 25-26, but this challenge is also without merit.  The Arid West Supplement instructs wetland delineators to use the latest plant lists approved by the Corps.  AR 4035, AR 4039.  Plant classification for purposes of wetland delineations at the time of the three Gasco delineations in 2008 were found in the National List of Plant Species that Occur in Wetlands: 1988 National Summary (the "1988 Plant List").  AR 4035, AR 4039.  The 1988 Plant List identifies saltgrass as a facultative species.  AR 4311.  Ms. Nall classified saltgrass as FAC and, as a result, the dominance test yielded a finding of hydrophytic vegetation.  Gasco's other consultant, Buys, also classified saltgrass as FAC and made a finding of hydrophytic vegetation based on that correct classification.  AR 2834-35, 2847, 2849, 2851, 2853.  Buys properly saw no need "to conduct any analysis to determine

---

[8]   SWCA identified an "unknown forb" at SP 18 that it designated as dominant but could not classify its indicator status.  Nonetheless, it assumed for purposes of the dominance test that it was an upland species, contrary to the Arid West Supplement instructions that requires that all dominants be identified as to species. If the unknown forb were a FAC species or not considered because unidentified, the dominance test would yield 100 percent OBL, FACW or FAC species.

whether the FAC plants on the Lamb Trust property were behaving like hydrophytes or halophytes." *See* Gasco Motion at 26.  Ms. Nall acknowledged SWCA's contrary opinion, based upon its second-guessing of the classification of saltgrass, but concluded that in her considered judgment the "evidence still supports this wetland parameter." AR 2674.  EPA reasonably relied on its own expert's findings and those findings are entitled to deference.  *See San Juan Citizens Alliance*, 654 F.3d at 1057; *Colorado Wild*, 435 F.3d at 1214.  SWCA's minority view does not render EPA's determination arbitrary or capricious.  *See National Cattlemen's Assoc.*, 773 F.2d at 271.

Gasco criticizes Ms. Nall's determinations for not undertaking additional analyses, Gasco Motion at 27, but such additional work is unnecessary when the dominance test is satisfied.  AR 4041.  The Arid West Supplement instructs that the hydrophytic vegetation indicators should be applied in the sequence presented in the manual. AR 4039.  Indicator 1, the dominance test, is "'the basic hydrophytic vegetation indicator and should be applied in every wetland determination." AR 4039.  Because the Arid West Supplement anticipates that most wetlands in the arid west will pass the dominance test, "the dominance test is the only indicator that needs to be used in most situations." AR 4039.  In this case, the plant species identified by Ms. Nall at all four of her sampling points met and passed the dominance test, so the additional procedures suggested by Gasco were unnecessary. AR 4041 ("[i]f the plant community passes the dominance test, then the vegetation

is hydrophytic and no further vegetation analysis is required").[9]  Ms. Nall's decision

not to employ any of these procedures was consistent with the Arid West

Supplement, and EPA's reliance on that decision was neither arbitrary nor

capricious.

> **B.  Substantial Evidence Supports EPA's Finding that the Well Pad and Access Road for Well #12-23 Were Constructed in Wetlands Based on the Presence of Hydric Soils.**

EPA based its wetlands findings on Ms. Nall's determination that the soils at

the #12-23 well pad and access roads were hydric soils.  Ms. Nall's determination

relied upon site location, soil mapping, landscape position and her consultation with

soils scientists.  Notwithstanding Gasco's experts' contrary conclusions, Ms. Nall's

determinations provided EPA with substantial evidence upon which it properly

based its wetland finding and issued the Compliance Order.

A hydric soil is a soil that is formed under conditions of saturation, flooding,

or ponding long enough during the growing season to develop anaerobic conditions

(*i.e.*, an environment with little available oxygen) in the upper part. AR 4047.

Saturation or inundation, when combined with microbial activity in the soil, results

in the depletion of oxygen.  These processes result in distinctive characteristics that

---

[9]     Gasco refers to "special procedures or additional analysis" contained in Chapter 5, but those procedures and analysis apply only to sites that lack any of the hydrophytic vegetation indicators presented in Chapter 2.  AR 4100 "[t]hese procedures should be applied only where . . . no indicators of hydrophytic vegetation are present").   Here, the site met the dominance test, which is one of the indicators presented in Chapter 2.  Moreover, Gasco cites to special procedures for wetland species dominated by FACU species that are functioning as hydrophytes.  Gasco Motion at 24; *see* AR 4046, 4108.  Saltgrass is a FAC species, not FACU, so even if special procedures would otherwise have applied, Gasco applied them incorrectly.

persist in the soil, making them particularly useful in identifying hydric soils.  AR 4047.

The Arid West Supplement presents indicators that are designed to help identify and delineate hydric soils.  AR 4047.  However, the indicators are not intended to replace the definition of a hydric soil.  *Id.*  Therefore, a soil that meets the definition of a hydric soil "is hydric whether or not it exhibits indicators."  AR 4047; AR 4048 (the "absence of any listed indicator does not preclude the soil from being hydric.")

EPA reasonably relied on the evidence obtained by Ms. Nall to support its finding based upon the presence of hydric soils.  Ms. Nall first observed and documented the site, as instructed by the Arid West Supplement.  AR 4051.  Ms. Nall observed the well pad for well #12-23 inundated on her June 2, 2008 site visit, and noted indirect evidence of ponding or flooding at other times.  AR 2673, 2686-93.  The site slope was nearly level and the well pad was placed in a low spot, where water would tend to collect.  *See* AR 2893 (photograph below)



MAY 28, 2008
12-23 ACCESS ROAD

GEI_00002893

SWCA concurs that well pad #12-23 "is located in the lower topographic portions of the project area." AR 2369.  Photographs taken by Gasco during June 2009, and forwarded to EPA confirmed the relatively lower elevation of the well pad and the presence of ponded water on the well pad when immediately surrounding areas no longer had standing water.  *See*, e.g., AR 1619-22.  The site is on a floodplain that is subject to seasonal flooding, which Gasco documented during 2008 and 2009.  AR 1610-1704; AR 2860-2925.  The vegetation, including FACW species at each of Ms.

Nall's four data points, indicated wetter conditions than at nearby upland sites.  AR 2686, 2688, 2690, 2692.

Ms. Nall also examined the soil mapping for the site, which indicated the presence of hydric soils.  The soil maps previously prepared by the Natural Resources Conservation Service independent of this case indicated the presence of an Umbo silty clay loam (85% of map unit) with inclusions of Wyasket silty clay loam (5% of map unit).[10]  AR 2201-05.  Both of these silty clay loams are listed as hydric soils on the Utah and National hydric soils lists.  AR 2638.  Although soil survey information does not preclude the need for an onsite investigation, AR 4073, the hydric soils list "should be used as a tool, indicating that hydric soil will likely be found within a given area." AR 4073.  Hydric soils are most likely to be found in the lowest topographic areas of the site, where water is most likely to collect and pond, which in this case is the location of well #12-23.  While the entire northern floodplain was mapped as the same soil unit, and included obvious upland areas, Ms. Nall determined that the soil mapping, when considered with the site location and landscape position at the low spot in the floodplain, prompted her to conclude the soils are problematic hydric soils. AR 2674.

Ms. Nall persuasively rebutted contrary views of SWCA, and EPA reasonably relied on those rebuttals.  For example, SWCA relied on the presence of intact salt concentrations in the soil columns as suggesting a lack of saturation.  AR 2370.  Ms. Nall disagreed with this conclusion, because as soon as a water table draws down in

---

[10]     The remaining 10 percent was comprised of alluvial flats and alkali flats.

seasonal wetlands, soluble salts re-precipitate (i.e., form concentrations).  AR 2674.

Thus, salt crystals are not a hydric indicator, but their presence does not preclude a

soil from being hydric.  AR 2674.  Gasco emphasizes that Ms. Nall did not

undertake additional tests to find hydric soil indicators, Gasco Motion at 35-36, and

obtained a negative reading on a test to determine if ferrous iron was present but,

as discussed above, the identification of hydric indicators is not required if the soil

is, in fact, hydric.[11]

In sum, substantial evidence in the administrative record based on site

location of well #12-23 in the floodplain of the Green River, its landscape position at

point of low elevation where water collects, vegetation and soil surveys supports

EPA's determination, certainly more than enough to withstand a motion for

directed verdict if this evidence were presented to a jury.  See *Colorado Wild*, 435

F.3d at 1213.

### C. Substantial Evidence Supports EPA's Finding that the Well Pad and Access Road for Well #12-23 Were Constructed in Wetlands Based on the Presence of Wetland Hydrology.

Numerous hydrologic indicators support EPA's wetland finding based, in

large part, on Ms. Nall's determination that the site exhibited wetland hydrology.

Well pad #12-23 was inundated for 23 days in 2008, the spring following the drilling

of the well.  AR 2673; AR 2860-2925.  Ms. Nall identified additional primary and

secondary indicators of hydrology at each sampling point that are sufficient, under

---

[11]    Ms. Nall consulted with the Natural Resource Conservation Service's
assistant state soil scientist, who offered several explanations for not finding certain
soil indicators at the site.  AR 2674.

the Arid West Supplement, to establish hydrology.  Gasco claims that the inundation in 2008 was not representative of ordinary conditions, but this at most creates a disagreement among experts, and does not deprive EPA's findings of support of substantial evidence in the administrative record.  Further, Gasco's arguments addressing revised flow releases from Flaming Gorge Dam are impermissibly based on materials outside of the administrative record, and in any event, do not address any relevant inundation or near surface saturation frequencies.

Wetland hydrology indicators are used in combination with indicators of hydric soil and hydrophytic vegetation to determine whether an area is a wetland. AR 4074.  Indicators of hydrophytic vegetation and hydric soils reflect a site's medium to long-term wetness history and provide evidence that episodes of inundation lasting more than a few days during the growing season have occurred repeatedly over a period of years.  AR 4074.  Wetland hydrology indicators provide evidence that the site has a continuing wetland hydrologic regime and that hydric soils and hydrophytic vegetation are not relics of a past hydrologic regime.  AR 4075.  "Wetland hydrology indicators are intended as one-time observations of site conditions *that are sufficient evidence of wetland hydrology* in areas where hydric soils and hydrophytic vegetation are present."  AR 4077 (emphasis added).

In this case, Ms. Nall identified numerous primary and secondary hydrologic indicators associated with well #12-23.  The Arid West Supplement states that the identification of one primary indicator or two secondary indicators is sufficient to

31

establish wetland hydrology.  AR 4078.  Ms. Nall identified three primary and three to four secondary indicators at each sampling point.  AR 2687, 2689, 2691, 2693. These included surface water, surface soil cracks, inundation visible on aerial imagery, water marks, sediment deposits, drift deposits and drainage patterns. SWCA similarly identified at least one primary or two secondary hydrologic indicators at each relevant sampling point.  AR 2415, 2417, 2419, 2425, 2427.  In addition, one of Gasco's employees documented with photographs that the well pad was inundated for at least 23 consecutive days, from May 23, 2008, to June 14, 2008.  2860-2925.  These wetland indicators are sufficient evidence, by themselves, of wetland hydrology because, as explained above, *supra* at 31, hydric soils and vegetation are present.  *See* AR 4077.

Moreover, the Green River inundated well pad #12-23 in 2009, 2010 and 2011.  The well pad was inundated for 17 days in 2009.  AR 1607-08.  Photographs also indicate inundation in June 2010, and from at least mid-May through the end of June during 2011, the latter being a particular wet year.  *See* AR 4378-80; AR 4383-4416.

Gasco criticizes Ms. Nall for visiting the site during spring runoff, Gasco Motion at 29, even though the Arid West Supplement expressly instructs that site visits occur during the wet season.  The Arid West Supplement states that "one or more site visits should be scheduled to coincide with the normal wet portion of the growing season, the period of the year when the presence or absence of wetland

hydrology indicators is most likely to reflect the true wetland/non-wetland status of the site." AR 4075.

Gasco also claims that the 2008 water levels were "not representative of typical conditions," Gasco Motion at 40, but Ms. Nall expressly considered and adequately addressed this issue.  The interpretation of hydrologic indicators requires an understanding of normal seasonal and annual variations in rainfall, temperature and other climatic conditions so that, for example, the indicators do not reflect unusually high river stages or runoff.  AR 4074-75.  Ms Nall examined precipitation data and historical flow data, and concluded that flow during the runoff of spring 2008 was "a fair representative of ordinary seasonal flows."  AR 2673.[12]

The frequency standard Gasco cites from the Arid West Supplement is not applicable here.  Gasco Motion at 38.  The Arid West Supplement instructs that, *in cases where hydrologic indicators are missing or misleading*, direct monitoring of surface and groundwater using water table monitoring wells may be needed to determine whether wetlands are present on highly disturbed or problematic sites.  AR 4120.  Only in this situation has the Corps established a standard that calls for 14 or more consecutive days of flooding, ponding, or a water table 12 inches or less below the soil surface during the growing season at a minimum frequency of five years in ten.  *Id.*  This standard does not apply here, where hydrologic indicators are plentiful and are sufficient, by themselves, to establish wetland hydrology.  As a

---

[12]     Contrary to Gasco's assertions, Gasco Motion at 42, the flow data Ms. Nall reviewed is in the administrative record.  *See, e.g.,* AR 154-59; 381-83; 384-402.

consequence, Gasco's efforts to establish that well #12-23 is not, based on SWCA's hydrologic analysis, inundated once every two years is based on an incorrect interpretation of the Arid West Supplement.  *See* Gasco Motion at 39-40.

Even if Gasco's misplaced arguments regarding hydrology were accepted, EPA reasonably relied upon the Corps' assessment of ordinary seasonal flows. Contrary to Gasco's arguments, Motion at 39, the Corps undertook an assessment of hydrological conditions specific to the Lamb Trust property by site visits that identified observable Arid West Supplement hydrology indicators and by a review of stream flow data on the Green River.  With respect to the latter, the Corps based its determination on multiple factors, including consultation with the United States Geologic Survey (USGS) regarding historical flow data for the Green River at the Jensen gage upstream from the Lamb Trust property, the Bureau of Reclamation's Record of Decision establishing revised flows for the Green River for the benefit of endangered species, and an "ordinary" recurrence interval of once every two to five years.  AR 2673.

The hydrology of the Green River at the Lamb Trust property is governed in part by releases from Flaming Gorge Dam, located 140 miles upstream.  AR 2667. Beginning in 1962, the spring runoff in the Green River has been impounded behind Flaming Gorge Dam and released primarily for power generation purposes.  *See* AR 2364.  As a result, as noted by SWCA, the Dam has "drastically reduced the magnitude and duration" of spring peak flows in the Green River after 1962.  *See* AR 2362.  Ms. Nall, using USGS gage data for the post-Flaming Gorge period,

determined that the level of spring runoff that occurred in 2008 also occurs, on average, once every three years.  AR 2673.

Gasco's experts' opinions based on their review of Green River flow data does not materially disagree with the Corps' conclusion.  SWCA based its flood frequency analysis on the post-Flaming Gorge period of record from 1965-2006.  AR 1996. SWCA opined that the Green River overflows its banks at flows greater than 17,000-18,000 cubic feet per second ("cfs") and that well pad #12-23 "becomes inundated at a discharge of *18,000 to 20,000 cfs or lower*, depending on the lag time between the discharge at Jensen and at Lamb Trust."  AR 2370 (emphasis added); *see* also AR 2857 (photographs taken showing inundation of well on May 23, 2008, and flow the prior day at Jensen gage of 18,900 cfs).  SWCA observed that "it is unknown whether a flood of 18,000 (the discharge estimated to first inundate the site) would keep the site inundated for a full 2 weeks."  AR 2368.  SWCA also mapped the extent of inundation at a flow of 20,000 cubic feet per second and showed that level of flow inundated the Lamb Trust property to a point upgradient of the #12-23 well pad.  *See* AR 1972.  SWCA further estimated that a flow of 20,000 cubic feet per second would occur once every three years under historical flow data from 1965-2006.  AR 1967 (Figure 2).  Thus, according to SWCA's analysis, a flow of approximately 18,900 cfs, which appears to be sufficient to inundate the #12-23 well pad based on the May 23, 2008, photograph and one day lag time from the Jensen gage, would occur more frequently than once every three years.  *See* AR 1967 (Figure 2); AR 2370 (sampling point 23 is potentially inundated more frequently

than approximately one in three years).  This is consistent with Ms. Nall's assessment of an "ordinary" recurrence.

Ms. Nall considered this information together with the increased flows planned under the 2006 Record of Decision for operations of Flaming Gorge Dam. Commencing in 2006, the Bureau of Reclamation changed its operations of Flaming Gorge Dam to increase the frequency of certain higher flows in order to benefit the endangered species of fish.  AR 0161-70  Of relevance to this case, the changed flow regime calls for a spring peak release of at least 18,600 cfs in Reach 2 (the reach at which the Lamb Trust property is located) for two weeks or more in at least one of four average hydrological years.  *See* AR 0167; AR 0171.  Thus, under the operation regime in place in 2008, compared to the 1965-2006 period evaluated by SWCA, , there should be an additional year of flooding once every four average hydrological years, when average hydrologic year flows that would not have otherwise flooded the Lamb Trust property.  These years of flooding in addition to the prior inundation frequency would result in flooding of the Lamb Trust property more frequently than one in three years.  Thus, to the extent frequency of inundation is relevant in addition to the presence of numerous hydrologic indicators to establishing hydrology, Ms. Nall's determinations are supported by the administrative record.

Gasco improperly relies on materials outside the administrative record to support its hydrology argument.  In Gasco's challenge under the APA, this Court confines its review of agency decisions to the full administrative record that was

before the agency at the time the agency made its decision. *WildEarth Guardians v. U.S. Forest Service*, 713 F. Supp. 2d 1243, 1252 (D. Colo. 2010). Thus, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Id.* (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973). The federal agencies' decision in this case must be reviewed upon the evidence before the agencies at the time the decision is made, and not upon materials received after the decision. *See New Mexico Envtl. Improvement Div. v. Thomas*, 789 F.2d 825, 834 (10th Cir. 1986); *American Mining Congress v. Thomas*, 772 F.2d 617, 626 (10th Cir. 1985) (agency action must be reviewed on the evidence that was before the agency at the time it made its decision).

For this reason, the Court should not consider Gasco's submission of a United States' brief in *Pierson v United States* and an expert report prepared by Edward P. Clark, both of which were attached to Gasco's motion. Neither document is in the administrative record and EPA did not consider either document in connection with issuing the Compliance Order. Gasco made no effort to complete or supplement the administrative record with either of these documents during the time allowed for such action under the Case Management Plan that governed submission of the administrative record. *See* Dkt. No. 11 (establishing January 4, 2013 deadline for filing motions to complete and/or supplement the administrative record). Further,

Gasco offers no explanation in its motion why such extra-record materials should be considered.  They should not be considered.[13]

## II.    Substantial Evidence in the Record and Applicable Law Support EPA's Finding that the Wetlands Associated with Wells #12-23 and #24-14 are Regulated under the Clean Water Act because They Are Adjacent to the Green River.

In *United States v. Riverside Bayview Homes*, 474 U.S. 121 (1985), the Supreme Court affirmed the Corps' regulatory jurisdiction under the Clean Water Act over wetlands adjacent to traditional navigable waters.  *See id.* at 134, 139.  The Supreme Court's more recent opinions in *Rapanos v. United States*, 547 U.S. 715 (2006), confirmed the use of adjacency to traditional navigable waters to establish regulatory jurisdiction.  Here, EPA reasonably found that the wetlands filled by Gasco are "adjacent" to the Green River, which Gasco agrees is a traditional navigable water.  Gasco's arguments rely primarily on incorrect legal standards and should be rejected.  Therefore, this final challenge by Gasco does not establish that the Compliance Order is arbitrary or capricious, or contrary to law.

---

[13]     Further, the opinions of Mr. Clark are not relevant to the issues presented in this case.  Mr. Clark suggested that the operations of Flaming Gorge Dam based on the 2006 ROD would not increase flooding, but made his analysis based upon an assumption that flooding occurs on downstream properties when flows at the Jensen gage are near 24,000 cfs.  *See* Gasco Motion Exhibit B at 10.  As explained above, and as found by SWCA, the Lamb Trust property experiences flooding at approximately 18,000 cfs.  Thus, the 2006 Record of Decision, which increases the frequency of flows of 18,600 cfs will result in an increase in the frequency of flooding at the Lamb Trust property.  *See* AR 0167.  In fact the Record of Decision expressly states that "the hydrology analysis shows that the greatest potential for negative effects to several resources . . . [is] associated with one particular flow recommendation, specifically a spring peak release of at least 18,600 cubic feet per second (cfs) in reach 2 for two weeks or more in at least one of four average hydrological years."  AR 0167.

**A. Wetlands Adjacent to Traditional Navigable Waters Are Subject to Regulation under the Clean Water Act.**

Both the Corps and EPA include within the regulatory definition of waters of the United States those wetlands adjacent to traditional navigable waters. 33 C.F.R. § 328.3(a)(1), (7); 40 C.F.R. § 230.3(s)(1), (7). A finding of adjacency to support regulatory jurisdiction requires a determination that the wetlands are "bordering, contiguous or neighboring" the water of the United States. 33 C.F.R. § 328.3(c); 40 C.F.R. § 230.3(b). Further, wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are "adjacent wetlands." *Id.* Gasco does not challenge the Corps' definition of adjacency. *See* Gasco Motion at 49-52. Rather, Gasco challenges the alleged absence of evidence in the record relating to two legal standards articulated in *Rapanos* that are not relevant to the Crops' finding of adjacency in this case – the showing of a continuous surface connection or a significant nexus between the wetlands and the Green River. Gasco Motion at 49-50.

The Supreme Court, in *Riverside Bayview Homes*, unanimously upheld the Corps' authority to regulate adjacent wetlands under the Clean Water Act. 474 U.S. at 139. In *Riverside Bayview Homes*, the Court addressed wetlands that were not flooded by, but extended to, a traditional navigable water. *Id.* at 130-31. The Court reviewed the Corps' determination that "adjacent wetlands that form the border of or are in reasonable proximity to other waters of the United States" are part of the same aquatic system, and held that the Corps' ecological judgment

provided an adequate basis for a legal judgment that adjacent wetlands may be properly regulated as waters under the Act. *Id.* at 134.

The Supreme Court's more recent decision in *Rapanos* did nothing to alter the holding in *Riverside Bayview Homes* that wetlands adjacent to traditional navigable waters are protected by the Act. In *Rapanos*, the Court addressed the regulatory jurisdiction under the Clean Water Act of "adjacent" wetlands, but did not generate a majority opinion. *See* 474 U.S. at 739-42 (plurality opinion); *id.* at 778-783 (Kennedy, J., concurring in the judgment); *id.* at 792-800 (Stevens, J., dissenting). When determining the controlling legal standards from *Rapanos*, all six United States Courts of Appeals that have addressed this issue have held that regulatory jurisdiction under the Clean Water Act can be established under the standard set forth in Justice Kennedy's concurring opinion. *See United States v. Johnson*, 467 F.3d 56, 66 (1st Cir. 2006) (concluding that the federal government can establish regulatory jurisdiction over waters that "meet either the plurality's or Justice Kennedy's standard as laid out in *Rapanos*"); *United States v. Bailey*, 571 F.3d 791, 799 (8th Cir. 2009) (same); *United States v Donovan,* 661 F.3d.174, 184 (3d Cir. 2011) (same); *Northern Cal. River Watch v. Wilcox*, 633 F.3d 766, 769 (9th Cir. 2011) (waters that satisfy Justice Kennedy's standard in *Rapanos* are within the scope of the Clean Water Act, but not foreclosing application of the plurality's standard); *United States v. Gerke Excavating, Inc.*, 464 F.3d 723, 724 (7th Cir. 2006)

(same); *United States v. Robison*, 505 F.3d 1208, 1221 (11th Cir. 2007) (finding that only the Kennedy standard can be used to establish Clean Water Act jurisdiction).[14]

Justice Kennedy, reiterating the unanimous holding in *Riverside Bayview Homes*, stated that regulatory jurisdiction over wetlands adjacent to traditional navigable waters can be upheld on a showing of adjacency based on the Corps' regulatory definition alone.[15]  Justice Kennedy wrote in his concurrence that "to constitute 'navigable waters' under the Act, a water or wetland must possess a 'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." *Rapanos,* 474 U.S. at 759.  Wetlands possess this significant nexus "if the wetlands, either alone or in combination with similarly situated wetlands in the region, significantly affect the chemical, physical, and biological integrity of other "navigable waters." *Id.* at 780.  With respect to wetlands adjacent to traditional navigable waters, such as the Green River, Justice Kennedy stated that "the Corps' conclusive standard for jurisdiction rests upon a reasonable inference of ecological connection, and the assertion of jurisdiction for those wetlands is sustainable under the Act by showing adjacency alone." *Id.* at 780.

---

[14]    The Fifth and Sixth Circuits declined to decide which standard controlled because the waters at issue in their cases met both Justice Kennedy's and the plurality's standards.  *United States v. Lucas*, 516 F.3d 316, 327 (5th Cir. 2008); *United States v. Cundiff,* 555 F.3d 200, 210-13 (6th Cir. 2009).

[15]    In Rapanos, Justice Kennedy and the four dissenting justices affirmed the Corps' definition of adjacency.  *See* 474 U.S. at 775 ("the Corps' definition of adjacent is a reasonable one, for it may be the absence of an interchange of waters prior to the dredge and fill activity that makes protection of the wetlands critical to the statutory scheme."); *id.* at 806 (the Crops' definition is "plainly reasonable, both on its face and in terms of the purposes of the Act.").

## B. The Administrative Record Supports EPA's Finding that the Wetlands Are Adjacent to the Green River.

EPA's finding that the wetlands are adjacent to the Green River is supported by substantial evidence in the record, including Ms. Nall's factual findings.

The wetlands at well #12-23 are adjacent to the Green River because they are regularly flooded by the river. The Supreme Court recognized in *Riverside Bayview Homes* that the Act's regulatory jurisdiction includes wetlands that result from flooding by water having its source in adjacent bodies of open water. *Id.* 474 U.S. at 130-31; *see also id.* at 134 ("the landward limit of federal jurisdiction . . . must include any adjacent wetlands that form the border of or are in reasonable proximity to other waters of the United States" (quoting 42 Fed. Reg. 37,128 (1977)). The wetlands at issue here are located in the floodplain of the Green River, separated from the river by a natural river berm. See AR 4011 (aerial photograph showing berm). Ms. Nall determined that the wetlands associated with well #12-23 were inundated by spring flows from the Green River for at least 23 days during 2008, and are inundated on a regular basis. *See supra* at 30, 32. These facts fit comfortably within the regulatory definition of "adjacent," i.e. "bordering, contiguous or neighboring."

The adjacency of the wetlands to the Green River is also established by the FWS' designation of the floodplain as critical habitat for endangered fish species that inhabit the Green River. The FWS spent over $100,000 to purchase a perpetual flowage easement at the location of both well sites to allow the Green River to intermittently and completely seep, flood, overflow and inundate the Lamb

Trust property to permanently enhance and protect flooded bottomland for endangered fish species in the Colorado River basin.  AR 0059, 0064

The adjacency is further established by the 2006 Record of Decision for operations of Flaming Gorge Dam.  The Record of Decision provided for increased flows during one of four average hydrological years that will increase the frequency of flooding of the wetlands in order to enhance the recovery of four endangered fish species.  *See supra* at 36.  Both the easement and Record of Decision support EPA's determination that the wetlands are neighboring the Green River, and are therefore adjacent to the river.

There should be no dispute regarding the substantial evidence supporting adjacency of the wetlands filled on the access road to well #24-14, because SWCA found these wetland to be subject to the regulatory jurisdiction of the Act.  SWCA stated in the conclusion of its report that the 0.08 acre of impacted wetlands on the access road "fall under the jurisdiction of the [Corps] due to the fact that they met established [Corps] criteria and because of their proximity to, or possible groundwater connection with, the Green River, which is a traditional navigable water of the U.S."  AR 2372.  Thus, the administrative record contains ample evidence that both SWCA and the Corps considered the wetlands at the access road to well #24-14 adjacent, and the record contains no contrary evidence.  EPA's determination is therefore supported by substantial evidence.

Gasco's remaining adjacency arguments focus on irrelevant issues.  SWCA determined that the wetlands are outside the ordinary high water mark of the

Green River, but this fact does not undercut EPA's determination.  Gasco Motion at

50.  The ordinary high water mark establishes the limits of regulatory jurisdiction

only in the absence of adjacent wetlands.  33 C.F.R. § 328.4(c)(1).  In contrast, when

"adjacent wetlands are present, jurisdiction extends beyond the ordinary high water

mark to the limit of the adjacent wetlands." *Id.* 328.4(c)(2).  EPA issued the

compliance order based on its determination that the wetlands were adjacent to the

Green River, so the ordinary high water mark of the river has no relevance.

Gasco focuses on the standard set forth by the *Rapanos* plurality that

required a "continuous surface connection" between the wetland and another water

of the United States, Gasco Motion at 49, but, as explained above, the plurality's

standard is not the sole standard for regulatory jurisdiction and the absence of

evidence in the record addressing this standard is of no consequence. *See supra* at

40-41.

Gasco also focuses on the alleged lack of evidence of a significant nexus under

Justice Kennedy's concurring opinion, but again this is not relevant.  Gasco Motion

at 51.  As explained above, Justice Kennedy found that when the Corps seeks to

regulate wetlands adjacent to traditional navigable waters, it may rely on adjacency

alone to establish its regulatory jurisdiction, and need not specifically demonstrate

a significant nexus. *Rapanos*, 547 U.S. at 782.  Because the filled wetlands are

adjacent to the Green River, a traditional navigable water, a case-specific

significant nexus analysis is unnecessary *See Bailey*, 571 F.3d at 799 ("Justice

Kennedy's opinion holds that when a wetland is adjacent to the navigable-in-fact waters, then a significant nexus exists as a matter of law.")

## CONCLUSION

For the reasons set forth above, this Court should deny Gasco's motion for partial summary judgment.

Respectfully submitted this 4th day of October, 2013.

> ROBERT G. DREHER
> Acting Assistant Attorney General
> Environment & Natural Resources
> Division
>
> s/ Alan D. Greenberg
> _____
> ALAN D. GREENBERG
> United States Department of Justice
> Environmental Defense Section
> 999 18th Street, Suite 370
> Denver, Colorado 80202
> Telephone: 303.844.1366
> Facsimile: 303.844.1350
> alan.greenberg@usdoj.gov
> *Attorney for the United States*

OF COUNSEL:

Sheldon Muller
U.S. Environmental Protection Agency
Denver, CO 80202

CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of October 2013, I electronically filed the foregoing United States' Corrected Memorandum in Opposition to Gasco Energy, Inc.'s Motion for Partial Summary Judgment with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following e-mail address of counsel of record:


L. Poe Leggette
Mark Barron
Fulbright & Jaworski LLP
1200 17th Street, Suite 1000
Denver, CO 80202
pleggette@fulbright.com
mbarron@fulbright.com

Kevin J. Lynch
Environmental Law Clinic
University of Denver Sturm College of Law
2255 E. Evans Ave.
Denver, CO 80208
klynch@law.du.edu



s/ Alan D. Greenberg

Alan D. Greenberg
Environmental Defense Section
U.S. Department of Justice
999 18th St., Suite 370
Denver, Colorado  80202
Phone: (303) 844-1366
Fax: (303) 844-1350
alan.greenberg@usdoj.gov